(No. 64182.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DANIEL HOLLAND, Appellee.

*Opinion filed December 21, 1987.—Rehearing denied April 5, 1988.*

CUNNINGHAM, J., took no part.
CLARK, C.J., specially concurring.
SIMON, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, and Thomas V. Gainer, Jr., Paula Carstensen, Rosanne T. Ossey, and Kenneth T. McCurry, Assistant State's Attorneys, of Chicago, of counsel), for the People.

Paul P. Biebel, Jr., Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Daniel Holland, was charged by indictment with two counts of aggravated kidnapping (Ill. Rev. Stat. 1979, ch. 38, pars. 10—2(a)(3), (a)(5)); two counts of rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1); two counts of deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3); one count of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2); and one count of aggravated battery (Ill. Rev. Stat. 1979, ch. 38, par. 12—4(b)(1)). These charges stemmed from the sexual assault of a female suburban Cook County teenager. The indictment also charged the defendant with two counts of aggravated battery as a result of a confrontation with two police officers after his arrest (Ill. Rev. Stat. 1979, ch. 38, par. 12—4(b)(6)) and one count of unlawful use of weapons within five years of release from a penitentiary (Ill. Rev. Stat. 1979, ch. 38, pars. 24—1(a)(9), (b)). On defendant's motion, the court severed the counts charging aggravated battery of a police officer and the count charging unlawful use of weapons. Trial proceeded before a jury in the circuit court of Cook County on the remaining counts of the indictment.

Defendant was found not guilty of aggravated battery but was found guilty of aggravated kidnapping, rape, deviate sexual assault, and armed robbery. The court en-

tered judgment on the verdicts and held a sentencing hearing to consider factors in aggravation and mitigation. At the conclusion of the hearing, the court found "that the offenses of rape, deviate sexual assault and aggravated kidnapping were 'accompanied by exceptionally brutal [or] heinous behavior indicative of wanton cruelty.' " (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2).) The court then sentenced the defendant to extended terms of 60 years' imprisonment for rape and deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(2)) and an extended term of 30 years' imprisonment for aggravated kidnapping (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(3)). These sentences were to run concurrently. As to the conviction for armed robbery, the court made a "separate and distinct" finding that the defendant's objectives changed during the course of the kidnapping from sexual gratification to armed robbery and that the sexual assault was completed before the armed robbery occurred. The court further found that this conviction was the defendant's fifth conviction for armed robbery and that society required protection from the defendant. On the basis of these findings, the court imposed a term of 25 years' imprisonment for armed robbery and ordered that it be served consecutively to the extended-term sentences already imposed. (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—4(a), (b).) The court further ordered that "[a]ll of these sentences shall be served consecutive to any parole violations."

Defendant appealed, raising numerous errors but principally contending that an inculpatory statement made during his post-arrest interrogation by an assistant State's Attorney violated his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) and should have been suppressed. A divided appellate court agreed, concluding that defendant's

waiver of his *Miranda* rights was invalid because he was not informed, prior to receiving his rights and giving an inculpatory statement, that an attorney was attempting to see him. The majority of the court also held that defendant's statement was inadmissible because it was the product of a police "subterfuge." (147 Ill. App. 3d 323, 337-38.) We granted the State's petition for leave to appeal pursuant to Supreme Court Rule 604(a) (103 Ill. 2d R. 604(a)).

The central issue presented is the validity of defendant's waiver of his *Miranda* rights. We also consider the following issues raised by the defendant: (1) that the State used its peremptory challenges to exclude black jurors in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; (2) that his trial counsel was ineffective; (3) that his conviction for armed robbery was improper because the State failed to prove that he took the complainant's property by force or threat of force; (4) that imposition of an extended-term sentence for aggravated kidnapping was improper; and (5) that imposition of consecutive sentences was improper. We first summarize the facts pertinent to these issues.

Testimony presented at the hearing on defendant's motion to suppress various post-arrest incriminating statements established that the defendant was the object of a traffic stop at approximately 8 a.m. on May 4, 1980, by a Schiller Park police officer because the vehicle he was driving did not have a rear license plate. The officer ordered a check of defendant's driver's license and found that it had been revoked. While awaiting the results of the driver's license check, the officer noticed that defendant's vehicle—a dark blue Chevrolet Camaro, his clothing—blue jeans, a jean jacket, a white T-shirt bearing the word "Superscrew," and his physical appearance matched information contained in a reported abduction

which occurred in Des Plaines, Illinois, at approximately 6 a.m. on May 4, 1980.

Defendant was arrested for improper vehicle registration, driving on a revoked license, and illegal transportation of alcohol. At the time of his arrest, a straight blade hunting knife was removed from his back pocket. Defendant was transported to the Schiller Park police station and, in a subsequent search, the complainant's high school identification card was found in a pocket of defendant's jacket. Also found in this search was $58.80 in currency and coins.

Schiller Park police then contacted Detective John Meese of the Des Plaines police regarding the arrest of the defendant. Detective Meese asked that the defendant be photographed and held pending further investigation. Detective Meese obtained the defendant's photograph from the Schiller Park police and presented it along with six others to the complainant. After she identified the defendant's picture as representing her assailant, Meese made arrangements to transport the defendant to the Des Plaines station. Prior to moving the defendant, Meese spoke by telephone to Anthony Rocco, who represented himself as defendant's attorney. According to Meese, Rocco asked to be notified if the defendant was to be placed in a lineup. Meese testified that he telephoned Rocco later that afternoon and left a message that the defendant would be in a lineup.

Meese transported the defendant to the Des Plaines station. Upon arriving, Meese advised him of his *Miranda* rights and was present during an interview conducted by Assistant State's Attorney Ira Raphaelson, accompanied by Assistant State's Attorney Howard Freedman. The interview began at approximately 2:05 p.m. on the afternoon of May 4.

Meese heard Raphaelson give the defendant his *Miranda* rights. About 20 minutes later, Raphaelson left

the interview room, leaving the defendant and Detective Meese alone together. At this time, Meese told the defendant:

"that we had received a report from the City of Chicago in reference to a female being raped in an alley. At that time his license plate was given as to the offending vehicle, and his vehicle was described as the same type vehicle.

At that time I told him that the woman could not make a positive identification of him; however, he would have to explain why his vehicle was at that particular location."

Meese also testified that, in fact, he had not received such a report. However, Meese stated that the defendant responded by saying "he now wished to tell the truth."

Meese summoned Raphaelson and remained in the room during this second interview. He testified that he again heard Raphaelson advise defendant of his *Miranda* rights. During this interview, the defendant gave an oral inculpatory statement in which he admitted that he had picked up the complainant and her companion on Irving Park Road in Des Plaines; that he forced the companion from his car; that he forced the complainant to accompany him; that he forced her to perform two acts of fellatio and also raped her on two separate occasions. In addition, he admitted taking the complainant's money and her high school identification.

Meese stated that the defendant did not complain of any injuries when he arrived at the Des Plaines police station. He stated that he observed no physical or mental coercion of the defendant during the two interviews conducted by Raphaelson. Meese also indicated that the defendant acknowledged that he understood his *Miranda* rights and at no time requested an attorney.

Assistant State's Attorney Ira Raphaelson testified at the suppression hearing that he interviewed the defend-

ant twice on May 4—once at approximately 2:05 p.m. and a second time at approximately 2:30 p.m. Raphaelson stated that he began the first interview by introducing himself and telling the defendant that he represented the State and not the defendant. He then advised the defendant of his *Miranda* rights. According to Raphaelson, defendant indicated that he understood his rights and agreed to talk. Defendant proceeded to give a false exculpatory statement in which he said that he had picked up a teenage girl and her boyfriend who were hitchhiking and that an argument ensued whereupon he ordered the two out of his car. The defendant explained his possession of the complainant's school identification card by saying that she had dropped it on the floor of his car, where he found it and placed it in the pocket of his jacket.

Raphaelson stated that he left the interview room. The defendant and Detective Meese remained inside with the door slightly open. Raphaelson stood about 10 feet from the door. He could not see the defendant, but he could see Meese, who was talking, presumably to the defendant. At approximately 2:30 p.m., Meese called him back into the interview room. Raphaelson reentered and again advised the defendant of his *Miranda* rights. Defendant again indicated that he understood his rights. He proceeded to give his oral incriminating statement.

Raphaelson testified that he then left the room and spoke to defendant's attorney, Anthony Rocco. According to Raphaelson, Rocco wanted to know what charges would be filed but did not ask to be present during any interviews or interrogations. Raphaelson also stated that, while he was aware that defendant's attorney had called the Des Plaines station, he was unaware of any request to speak with the defendant prior to any interviews. At approximately 4 p.m. on May 4, Raphaelson informed Rocco of the charges against the defendant.

Defendant's wife, Patricia Holland, also testified at the suppression hearing. She stated that a Schiller Park officer notified her around 8:30 a.m. on May 4, 1980, that her husband had been arrested for several traffic violations and that she should come to the station to post bond. Later that morning, she was informed that her husband was being held for the Des Plaines police, who were preparing other charges against him. Mrs. Holland was not told what charges were contemplated.

Mrs. Holland then contacted Anthony Rocco and requested that he represent her husband. She reached Rocco around 1 p.m. on May 4. During that afternoon, she spoke to him on several occasions. During each conversation, Rocco related his unsuccessful efforts to see the defendant. Mrs. Holland further testified that she met attorney Rocco at the Des Plaines station around 3:45 p.m. Shortly thereafter, Rocco was permitted to meet with the defendant.

The defendant testified at the suppression hearing, stating that he spoke to his wife by telephone around 8:30 a.m. on May 4, 1980. He was in the custody of the Schiller Park police. He stated that he told his wife to contact attorney Rocco so that he could arrange for the defendant's release.

Defendant further testified that, while in the custody of the Schiller Park police, an officer pulled his hair. As he resisted, defendant stated, his hands were handcuffed behind him and his "arms were elevated to where [he] couldn't stand on [his] feet. [He] was knocked to the ground, kicked, hit." The defendant also stated that he was punched with a 40-inch night stick "where I would be covered with clothing." As a result, defendant stated that he lost tufts of hair, that his ribs hurt, and that his right knee became swollen. He testified that he was hit repeatedly under his chin with a billy club while his "mug shot" was taken. When he resisted, he was

knocked to the floor and beaten again. Defendant received no medical treatment while at the Schiller Park station.

Defendant further testified that he was mistreated by Detective Meese of the Des Plaines police after he arrived at the Des Plaines station. According to the defendant, between the first and second interview with Assistant State's Attorney Raphaelson, he was left alone with Meese. During this time, Meese jabbed him in the ribs for about 5 to 10 minutes. Meese then said that the defendant "better start answering questions or he was going to kick my ass." Shortly thereafter, Raphaelson returned. However, defendant did not tell Raphaelson about Meese's physical mistreatment or about his verbal threat. According to the defendant, he then told them "what [he] believed [they] wanted to hear." There followed an incriminating statement in which defendant admitted that he had picked up the complainant and her boyfriend; that he forced the boyfriend out of the car; that he forced the complainant to perform two acts of fellatio; that he raped her. Defendant stated that, throughout this entire period, no one advised him of his *Miranda* rights.

Defendant also testified that, after his arrival at the Des Plaines station, he repeatedly asked for an attorney. Ultimately, he did see his attorney, Anthony Rocco, but not until he had given his inculpatory statement and had been placed in a lineup. When he did see his attorney, defendant told him of the physical mistreatment he had received. On May 5, defendant stated that he was taken to Cermak Hospital, where he was told that he probably had fractured ribs in the mid-chest area. Defendant was given medication for pain and told to take sitz baths for his knee.

Anthony Rocco, defendant's attorney, also testified at the suppression hearing. He testified that he first saw

the defendant at 4 p.m. on May 4 and that he was limping. Rocco stated that the defendant said that he had been beaten and showed Rocco his right knee. According to Rocco, the knee was discolored. Rocco also stated that the defendant said that he had been mistreated by the Schiller Park police and by Detective Meese of the Des Plaines police.

Attorney Rocco did not testify regarding his various attempts to reach the defendant and talk to him prior to any questioning. However, during his closing argument on the motion to suppress, Rocco stated that he talked to Detective Meese by telephone around 1 p.m. on May 4 and specifically requested to talk to the defendant prior to any questioning. Rocco also argued that, sometime between 1 and 3 p.m., he made this same request of Assistant State's Attorney Raphaelson. Rocco concluded his argument by noting that he was not permitted to see the defendant until after he had given an incriminating statement and had been placed in a lineup.

At the close of testimony on defendant's motion to suppress, the court concluded "that [the] degree of physical confrontation contaminate[d] any statements defendant would have made at the Schiller Park Police Station, and accordingly any statements made relevant to this cause made by the defendant in the Schiller Park Police Station *** are hereby suppressed, and suppressed in toto." The court also found that the defendant was given his *Miranda* rights by Assistant State's Attorney Raphaelson and further found that "no physical cruelty was proved to be exerted by the police department in Des Plaines." The court concluded that defendant's "will was not overborne, and he acted without any compulsion or inducement of any sort whatsoever, and he received his rights, and he acted freely and voluntarily and intelligently when he made the statements of 2:05 and 2:30."

The case against the defendant proceeded to trial. During opening arguments, the State made no mention of defendant's incriminating statement in reviewing what it expected to prove and by what evidence. However, defense counsel Rocco did refer to defendant's inculpatory statement during his opening argument.

The State's principal witness was the complainant. She testified that she and her boyfriend left a party they were attending around midnight on May 4, 1980. A short while later, they discovered that their car had a flat tire. After pulling off onto the shoulder of Irving Park Road in Des Plaines, they found that the spare tire was flat as well. They turned on the car's emergency flashing lights, but no one stopped to give assistance. After about an hour, they decided to sleep in the car and go for help in the morning. They turned off the flashing lights, turned on the parking lights, and went to sleep.

The two awoke at dawn, approximately 6 a.m., on May 4 and began walking down Irving Park Road. Almost immediately, the defendant drove up in a blue Chevrolet Camaro and offered to give them a ride. They accepted and got into defendant's car. The complainant sat in the front passenger seat while her companion sat in the back seat. After driving around awhile, the defendant grabbed the complainant around her shoulder, placed a knife to her throat, and ordered her companion out of the car. When he refused to exit, the defendant said that he would kill the complainant unless he complied. He acquiesced and the defendant drove off with the complainant.

The complainant continued, testifying that the defendant held the knife under her arm while he drove. Defendant proceeded to the parking lot of an apartment complex where he ordered her to disrobe. After undressing, she testified that the defendant pushed her head into his groin area, where his penis entered her mouth.

Defendant then stated, "you're not getting it hard," whereupon he cut her on the right leg from the upper thigh to the hip.

She stated that the defendant began driving again while his penis remained in her mouth. The defendant drove to an alley on Diversey in Chicago and parked. She said that a woman saw them drive into the alley. The defendant stopped the car and forced her to straddle him and the defendant's penis entered her vagina. Defendant then ordered her out of the car and forced her to perform a second act of fellatio. Next, he told her to turn around and face the car, at which time she again felt his penis enter her vagina.

Defendant returned her clothes and told her to get dressed. He then told her to close her eyes and, when she asked why, he said, "it'll be easier that way. I'm going to knock you out." The complainant testified that she told him he could have anything he wanted, giving him her high school identification card while the defendant took her money, approximately $60. She concluded her testimony by stating that she began walking towards a grocery store and that she observed the defendant drive away in a vehicle that did not have a rear license plate.

The testimony of the victim's boyfriend corroborated the complainant's testimony about the events leading up to the abduction. He testified further that he was shown a picture of the defendant along with several other pictures and identified that of the defendant as representing the man who offered him and the complainant a ride on the morning of May 4, threatened him, and drove off with her. During his testimony, he also made an in-court identification of the defendant.

Medical testimony was presented confirming that the complainant had been cut on the right leg. There was also medical testimony confirming the presence of semen

and spermatozoa in the vaginal swab taken from the complainant approximately an hour and a half after her release.

The State rested its case in chief. The defense elected not to present a case. Defense counsel, however, cross-examined all of the State's witnesses at length, establishing, among other things, that the semen and spermatozoa found in the vaginal swab could not be linked directly to the defendant nor could its age be determined; that no semen was found in the crotch of the bib overalls worn by the complainant; that no semen was found on defendant's underwear or on the jeans worn by the defendant; that the complainant's fingerprints were not found either in or on the defendant's automobile. During closing argument, defense counsel reviewed the State's case in detail. He concluded by saying, "Think of all the factors I've pointed out to you. I must have pointed out to you 20, 30 reasonable doubts in my opinion. Consider those." Defense counsel also reminded the jury that the defendant had been subject to physical force by police.

The first issue on appeal is the validity of the defendant's waiver of his privilege against self-incrimination after receiving his *Miranda* rights while in custody at the Des Plaines police station.

The State contends that the appellate court erred in holding defendant's waiver invalid because it was given without knowledge that an attorney was attempting to confer with him. In support of its position, the State argues that this case is controlled by *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135. In *Burbine*, a custodial suspect confessed after receiving and waiving his *Miranda* rights. He did so without knowledge that his sister had retained an attorney to represent him and that an associate of the attorney had been in telephone contact with the police specifically in-

dicating that "she would act as Burbine's legal counsel in the event that the police intended to place him in a lineup or question him." While the associate was told that Burbine would not be questioned until the following day, police in fact interrogated him later that evening, securing three written statements which Burbine was unsuccessful in suppressing.

The Supreme Court concluded that a suspect's knowing and intelligent waiver of his *Miranda* rights does not require knowledge that an attorney has been retained or information that the attorney has been in contact with the police or has attempted to see the suspect. The Court held that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Moran v. Burbine* (1986), 475 U.S. 412, 422-23, 89 L. Ed. 2d 410, 422, 106 S. Ct. 1135, 1142.) Since the *Burbine* standard was met in this case, the State urges that we apply it and hold that defendant's waiver was valid.

The defendant argues that the appellate court was correct in rejecting *Burbine* and following instead this court's decision in *People v. Smith* (1982), 93 Ill. 2d 179. Initially, defendant notes that the *Burbine* Court expressly invited the States to adopt more stringent standards for evaluating a suspect's waiver of his *Miranda* rights under applicable State constitutional provisions when it stated that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." (*Moran v. Burbine* (1986), 475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145.) The defendant urges that we accept this invitation and apply *Smith* to find that his privilege against self-incrimination guar-

anteed by article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §10) was violated when the Des Plaines police and the assistant State's Attorney failed to inform him that an attorney had been contacted and was attempting to see him.

We decline defendant's invitation. In our view, *Smith* and *Burbine* are clearly distinguishable cases with *Burbine* being virtually on all fours with the instant case. Here, as in *Burbine*, a relative secured counsel for the suspect; the suspect was unaware that counsel had been retained; all communication between the police or prosecutors and the attorney was by telephone. *Smith* differs significantly from *Burbine* and the instant case. In *Smith*, the suspect actually met with an attorney after his arrest and personally retained him as counsel. Further, a partner of the retained counsel personally went to the jail where defendant was being held and asked to meet with him. She did not limit her communications to telephone conversations with the authorities or ask to be notified in the event authorities anticipated questioning her client or placing him in a lineup. Applying *Burbine*, we hold that the defendant was given his *Miranda* rights at the Des Plaines police station, that he understood the nature of those rights, and that his *Miranda* waiver was valid despite the fact that he was not told that an attorney wanted to confer with him prior to any interrogation or lineup.

The appellate court also held that defendant's *Miranda* waiver was invalid because it was secured by Detective Meese's "subterfuge." Meese told the defendant that he had received a report from the Chicago police department that his vehicle was seen in the same alley where the complainant was raped and that he would have to explain why his vehicle was there. However, no such report existed.

The State argues that this "subterfuge" does not invalidate the defendant's *Miranda* waiver. The State maintains that neither the Supreme Court nor this court has held that a lie, misrepresentation, or half-truth is sufficient to invalidate a *Miranda* waiver. *Frazier v. Cupp* (1969), 394 U.S. 731, 739, 22 L. Ed. 2d 684, 693, 89 S. Ct. 1420, 1425 (a false statement by police that his co-defendant had confessed "is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible"); *People v. Kashney* (1986), 111 Ill. 2d 454, 465-67 (a false statement by an assistant State's Attorney that defendant's fingerprints were found at the scene of an alleged rape is insufficient to invalidate a *Miranda* waiver); *People v. Martin* (1984), 102 Ill. 2d 412, 426-27 (same).

The defendant responds by arguing that, while a misrepresentation standing alone may not invalidate a *Miranda* waiver, a misrepresentation which is coercive in effect will invalidate the waiver. Defendant relies on *Lynumn v. Illinois* (1963), 372 U.S. 528, 530-35, 9 L. Ed. 2d 922, 924-27, 83 S. Ct. 917, 918-21, and *Spano v. New York* (1959), 360 U.S. 315, 319, 322-23, 3 L. Ed. 2d 1265, 1269, 1271-72, 79 S. Ct. 1202, 1205, 1206-07. In *Lynumn*, the Supreme Court invalidated a confession given after police told the defendant that, if she did not cooperate, her children would be taken away and she would lose her public aid. The Court held that these statements amounted to threats and that Lynumn's confession was coerced. In *Spano*, the defendant, upon his arrest, telephoned a close friend who, at the time, was enrolled in a police academy. On four separate occasions, the friend's police superiors ordered him to play on the defendant's sympathy by telling the defendant "that [his] telephone call had gotten him into trouble, that his job was in jeopardy, and that loss of his job would be disastrous to his three children, his wife, and his unborn

child." In fact, the friend's job was in no way placed in jeopardy by the defendant's call. On the totality of the circumstances, the Court held that the defendant's will was overborne, which rendered his confession involuntary. However, use of the defendant's friend and the friend's false statement that his job was endangered was only one of a number of factors which rendered the confession involuntary. Spano was foreign born, emotionally unstable, with no criminal history, and was subject to questioning for eight continuous hours.

*Lynumn* and *Spano* are clearly distinguishable from the case at bar and, in our view, do not control. Unlike *Lynumn*, Detective Meese's so-called "subterfuge" was not employed to suggest that the defendant would suffer physical, emotional, or material harm if he did not explain the presence of his automobile in the alley where the complainant was raped. Here, unlike *Spano,* there is no indication that the defendant lacked the capacity to understand his rights. He was questioned only briefly. Finally, Meese's statement did not threaten or imply that either the defendant or a loved one would be harmed in some way if the defendant asserted his right to remain silent rather than explain the presence of his automobile in the alley.

We also find unconvincing defendant's contentions that Meese's statement was false or misleading. It is true that Meese had not received a Chicago police report placing defendant's vehicle in the alley. However, the complainant testified that a woman saw the defendant drive into the alley where he then raped her, and the record indicates that Meese spoke to the complainant before interviewing the defendant. We hold, therefore, that defendant's waiver of his *Miranda* rights was unaffected by Meese's statement and is valid.

Defendant, however, advances a third argument in support of his contention that his *Miranda* waiver was

invalid. He argues that his physical mistreatment by Schiller Park police should be imputed to the Des Plaines police and the assistant State's Attorney. Under his theory, physical coercion by one governmental entity renders involuntary any statements made to another governmental entity even though no physical force is used by the second entity. In support of this argument, defendant relies on *People v. Thomlison* (1948), 400 Ill. 555, 562-64, and *People v. Santucci* (1940), 374 Ill. 395, 398-401. In *Thomlison*, the defendant confessed to Alton, Illinois, police the day after being "brutally assaulted" by members of the same police force. In *Santucci*, the defendant confessed to Chicago police three days after being "severely beaten" by members of the Chicago police force in an unrelated incident. In both cases, this court held that the confessions were involuntary because the physical coercion of the first encounter carried over to and tainted the encounter which produced the confessions. Since the circuit court, in the instant case, suppressed defendant's statements made to the Schiller Park police because it found that there had been some type of "physical confrontation" while the defendant was in their custody, defendant concludes, on the authority of *Thomlison* and *Santucci*, that the "physical confrontation" tainted the interrogation by the Des Plaines police and the assistant State's Attorney which resulted in his oral incriminating statement. We do not agree.

Our review of the record indicates that there was no affirmative showing that the defendant was beaten by Schiller Park police. The defendant, testifying during the suppression hearing, claimed that he was beaten. However, two counts of the indictment against the defendant were for aggravated battery of two Schiller Park officers. At the conclusion of the suppression hearing, the court did not find that the defendant had been beaten

but, rather, that there had been some sort of "physical confrontation." The court gave the defendant the benefit of any doubt and suppressed all statements made while in the custody of the Schiller Park police. However, in the absence of an affirmative finding of physical coercion by the Schiller Park police, there can be no coercion available to infect either the interrogation of Detective Meese of the Des Plaines police or the interrogation of Assistant State's Attorney Raphaelson.

The "physical confrontation" between the defendant and the Schiller Park police had no bearing on the events which transpired between the defendant and the Des Plaines police or the assistant State's Attorney. Accordingly, we conclude that the statement made by the defendant to the assistant State's Attorney while in the custody of the Des Plaines police was not coerced.

Defendant presses two other arguments in support of the appellate court's decision reversing his conviction. First, he contends that the State used its peremptory challenges to excuse two black prospective jurors solely on the basis of their race in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

We decline to address this issue because we find that the defendant, a Caucasian, does not have standing to assert a *Batson* violation. Under *Batson*, the defendant challenging the exclusion of prospective jurors because of their race must show "that members of *his race* have been impermissibly excluded." (Emphasis added.) (476 U.S. 79, 93, 90 L. Ed. 2d 69, 85-86, 106 S. Ct. 1712, 1721.) Since defendant is white and the excluded prospective jurors are black, he is unable to show that members of his race have been excluded impermissibly. Thus, he is unable to establish the threshold element of a *prima facie Batson* violation.

Defendant argues, in the alternative, that the exclusion of the only two black prospective jurors in the jury array violated his sixth amendment right to trial by a jury representing a fair cross-section of the community. Neither this court (*People v. Gaines* (1984), 105 Ill. 2d 79, 88; *People v. Williams* (1983), 97 Ill. 2d 252, 278-80) nor the Supreme Court (*Batson v. Kentucky* (1986), 476 U.S. 79, 84-85 n.4, 90 L. Ed. 2d 69, 79 n.4, 106 S. Ct. 1712, 1716 n.4) have so held. We decline to overrule this court's prior holdings by finding that the peremptory exclusion of blacks or other minorities violates the fair cross-section requirement.

Defendant next argues that he received ineffective assistance of counsel at trial and urges this ground as an alternative basis for affirming the reversal of his conviction. According to the defendant, the State had decided not to use his inculpatory statement as part of its case in chief. However, the State reversed its position and placed the statement into evidence after defense counsel specifically mentioned the defendant's statement in opening argument before the jury. The defendant claims that this is an example of his counsel's ineffectiveness. The defendant also claims that cross-examination by counsel was often "irrelevant," "suggestive," "misleading," and "improper," forcing the trial court into frequent off-the-record admonitions. Defendant maintains that this conduct is indicative of incompetence.

To prevail on a claim that trial counsel was ineffective a defendant must show that counsel's performance fell "outside the wide range of professionally competent assistance" and "but for counsel's [incompetence], the result of the proceeding would have been different." *Strickland v. Washington* (1984), 466 U.S. 668, 690, 694, 80 L. Ed. 2d 674, 690, 698, 104 S. Ct. 2052, 2066, 2068; *People v. Collins* (1985), 106 Ill. 2d 237, 273-74; *People v. Albanese* (1984), 104 Ill. 2d 504, 525-27.

Our reading of the record leads to the conclusion that the defendant has failed to sustain his burden on either prong of the *Strickland* test. As to the competence of defendant's trial counsel, we note that he succeeded in severing three counts of the indictment against the defendant. Trial counsel also succeeded in suppressing defendant's statements made to the Schiller Park police and was vigorous, if unsuccessful, in his efforts to suppress the incriminating statement given to the assistant State's Attorney at the Des Plaines station. Counsel's defense was effective enough to win a verdict of not guilty on the charge of aggravated battery of the victim.

Counsel was effective in creating a record which provided several grounds on which to challenge on appeal the validity of defendant's *Miranda* waiver. During selection of the jury, counsel challenged the State's use of its peremptory challenges to exclude black prospective jurors.

The record also reveals that counsel was vigorous in his cross-examination of witnesses with the apparent purpose of raising reasonable doubt in the minds of the jurors. For example, counsel brought out the fact that the complainant's fingerprints were not found either in or on the defendant's automobile. He also established that there was no semen found on defendant's underwear or other clothing and that the semen found on the complainant's clothing and in her vaginal swab could not be linked positively to the defendant. Finally, in closing argument, counsel stressed the inconsistencies he had developed during cross-examination, arguing that each one raised a reasonable doubt and that each one would support a verdict of not guilty on all counts.

The record establishes that counsel was active in his defense both in pretrial proceedings and during trial. On the totality of this record, the fact that he was first to raise defendant's inculpatory statement pales into insig-

nificance. Further, even if we were to conclude .that the reference to defendant's inculpatory statement was incompetent, it would remain incumbent upon the defendant to show that, but for that error, he would have been found not guilty. In view of the accurate and unwavering in-court and out-of-court identifications of the defendant by the complainant and her companion, we believe that there was ample evidence adduced to find the defendant guilty beyond a reasonable doubt. Therefore, even if it was error to raise the existence of defendant's incriminating statement, it cannot be deemed prejudicial on this record. We conclude that the defendant has not established that he received ineffective assistance of counsel.

Defendant also challenges his conviction for armed robbery affirmed by the appellate court. He contends that the State failed to prove that he took the complainant's school identification and money by force or threat of force, an essential element of the offense of armed robbery. After a thorough review of the record on this issue, we find ample support for defendant's armed robbery conviction.

The complainant testified that, after the final sexual assault, the defendant returned her clothing and told her to get dressed. After she did so, the defendant told her to close her eyes and, when she asked why, replied, "it'll be easier that way. I'm going to knock you out." To avoid further physical attack, she offered the defendant "anything he wanted." She then handed over her identification and the defendant took her money. Throughout this exchange, the defendant remained armed with the hunting knife he had displayed during the entire course of his sexual attacks on the complainant.

It is clear from the complainant's uncontradicted and unimpeached testimony that she parted with her property in order to avoid being a victim of yet another act of violence. Under these circumstances, the State proved

beyond a reasonable doubt that the property of another was taken by force or threat of force. (*People v. Tiller* (1982), 94 Ill. 2d 303, 316.) We, therefore, affirm defendant's conviction for armed robbery.

Defendant's final two issues concern sentencing. He first contends that the circuit court erred in imposing an extended-term sentence on the conviction of aggravated kidnapping because it is not an offense of "the class of the most serious offense of which the offender was convicted." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a).) He contends that aggravated kidnapping is a Class 1 felony while rape and deviate sexual assault are Class X felonies. He concludes that, under the extended-term sentencing provision, only the convictions for rape and deviate sexual assault can provide the basis for extended-term sentences.

The State concedes that the extended-term sentence for aggravated kidnapping was improper. Therefore, on the authority of *People v. Jordan* (1984), 103 Ill. 2d 192, 204-07, and *People v. Evans* (1981), 87 Ill. 2d 77, 87, we vacate defendant's sentence for aggravated kidnapping.

Defendant's final challenge is directed at the imposition of a consecutive sentence on the armed robbery conviction as well as the court's order that all sentences for the instant convictions were to be served consecutively to "any parole violations." We first consider the propriety of a consecutive sentence for the armed robbery conviction.

Section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—4(a), (b)) provides that a consecutive sentence may be imposed where the court finds: (1) that the offense receiving the consecutive sentence was substantially different from the other offenses for which the defendant was sentenced, and (2) that imposition of a consecutive sentence is necessary to

"protect the public from further criminal conduct by the defendant."

The record reveals that the circuit court expressly found that the defendant's objective changed during the course of the kidnapping. The court also found that the initial motivation for the kidnapping was sexual gratification and further found that the sexual assault was completed at the time the defendant robbed the victim. The court then referred to the defendant's prior convictions for four armed robberies and concluded that society required protection from the defendant's future criminality. The court then ordered that the sentence for armed robbery be served consecutively to the concurrent sentences imposed for rape, deviate sexual assault, and aggravated kidnapping.

A consecutive sentence imposed pursuant to applicable law and supported by the record will not be disturbed on review. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323.) We believe that the court had ample grounds to impose a consecutive sentence for the armed robbery conviction.

It is manifest beyond peradventure that, at the time of the armed robbery, the sexual assault of the complainant had terminated and that the defendant was preparing to release her. The complainant testified that the defendant had returned her clothes and that she was dressed when the defendant threatened to "knock her out," subsequently taking her identification and money. After taking possession of this property, the defendant allowed her to leave and, while leaving, she saw him drive away.

It is also clear that society requires protection from the defendant. He committed a traumatic series of sexual assaults over the course of two hours upon a teenage girl, threatened to kill her throughout the ordeal, and threatened to kill her if she reported the incident to the

police. These events occurred while the defendant was on parole on four convictions for armed robbery, the same offense committed here. Thus, there is more than adequate support for the court's order that the sentence for armed robbery be served consecutively, and we affirm this order.

Defendant's second sentencing challenge is to the court's order that all sentences imposed in the instant case were to be served consecutively to "any parole violations." He contends that a sentence consecutive to "any parole violations" is insufficiently specific and that remand for resentencing is required.

The State argues that the court meant to order that the sentences in the instant case were to be served consecutively to defendant's reconfinement for violation of parole on his prior armed robbery convictions. According to the State, the record shows the case numbers of the prior convictions in addition to a presentence report containing a notation of these convictions along with a narrative indication that a warrant for parole violation had issued, with the Prisoner Review Board preparing to take action at a later date.

This court has affirmed imposition of sentences consecutive to an unrelated prior sentence where the completion of the prior sentence and the beginning of the later sentence can be ascertained from the record. (*People v. Toomer* (1958), 14 Ill. 2d 385, 387.) We agree with the State that the necessary certainty can be derived from this record and, therefore, affirm the order that the sentences in the instant case are to be served consecutively to any remaining portion of the defendant's sentence for the four prior armed robbery convictions.

For the reasons stated herein, we reverse the judgment of the appellate court. We affirm defendant's convictions and all sentences with the exception of the extended-term sentence for aggravated kidnapping, which

is vacated. The cause is remanded to the circuit court of Cook County for resentencing on the aggravated kidnapping conviction.

*Appellate court reversed;*
*convictions affirmed;*
*cause remanded.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.

CHIEF JUSTICE CLARK, specially concurring:

I specially concur.

I concur in the result only because I agree with the State that the defendant's attorney did not in fact request access to his client. If the attorney had actually requested access to his client, the failure to so inform the client of this fact would, in my opinion, render invalid the client's subsequent waiver of his State constitutional privilege against self-incrimination. I deal with each of these points in turn.

I

The State argues, to my mind convincingly, that the defendant's attorney, Anthony Rocco, did not request access to his client. Rocco testified at the suppression hearing. He failed to mention any attempt to speak with his client. While the opinion states that the defendant's wife testified that Rocco had "related [to her] his unsuccessful efforts to see the defendant" (121 Ill. 2d at 146), it does not state what these efforts were. Officer Meese testified only that Rocco called him and asked to be notified before the defendant was placed in a lineup. He further testified that he did in fact call Rocco and attempt to notify him of the lineup, leaving a message on Rocco's answering machine.

On cross-examination, Rocco asked Meese whether he, Rocco, had also told Meese that he wanted to see and speak with the defendant before interrogation. Meese denied this. Only during his closing argument on the motion to suppress did Rocco directly assert that he had asked to see the defendant.

It is elementary that the factual determinations of the trial court on a motion to suppress are not to be overturned unless manifestly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 99.) The trial court here was entitled to conclude that Meese's testimony as to what Rocco had said was more credible than the defendant's wife's hearsay account of what Rocco told her he had said to Meese. As for Rocco's statements during closing argument, these were not evidence. (See *People v. Carlson* (1982), 92 Ill. 2d 440, 449.) The appellate court's contrary conclusion was based upon a misreading of the record; it is simply not true that the "defendant's attorney *** *testified* at the pretrial hearing on the defendant's motion to suppress the defendant's statements that he asked to talk to the defendant when he spoke with Officer Meese on the telephone." (Emphasis added.) (147 Ill. App. 3d 323, 336.) He did not testify; at best, he alleged.

I would therefore reverse the appellate court on the ground that the claimed effort to prevent the attorney from conferring with his client simply did not take place. I also agree with the majority that the defendant's other claims of error are erroneous. There was no affirmative finding of a physical confrontation by the Schiller Park officers, and Meese's statement about the police report had some basis in fact. Further, I agree that the defendant, who is white, has no standing to assert a *Batson* violation based on the exclusion of black jurors. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) However, since the majority has chosen to ad-

dress the attorney access issue, I take this opportunity to express my own view on its merits.

## II

From time immemorial the practice of holding suspects *incommunicado* has been rightfully abhorred. Courts have viewed with suspicion efforts to prevent lawyers from meeting with their arrested clients, even where the client has not formally invoked his right to meet with the lawyer. In fact, continued interrogation of a client who has not been informed of his attorney's contemporaneous efforts to meet with him has been nearly universally condemned.

The endorsement of such interrogation inevitably degrades and deforms our adversary system of criminal justice. It encourages law enforcement officials to treat the defendant's attorney as a supernumerary figure, an inconsequential busybody whose efforts on behalf of his client can be—and undoubtedly will be—rejected with contempt. It simultaneously weakens the client's ability to make a knowing and intelligent waiver of his rights by depriving him of a critical piece of information.

Such interrogation conflicts with an adversarial system of justice. It offends against traditional notions of justice and fair play.

I am therefore sorry to see the majority endorse this practice.

As I understand the majority's opinion, it holds either: (1) that the constitutional guarantee against self-incrimination contained in our State Constitution does not prohibit the police from denying an attorney access to his client, or (2) that our State Constitution prohibits only the denial of access to an attorney who is actually present at the site of interrogation, but not to an attorney who merely telephones the station house. Whichever is the court's actual holding, I do not agree.

To understand the nature of my disagreement it is necessary to review some of the prior case law. A review of that history demonstrates that we are not compelled by *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, to adopt an overly restrictive view of our own constitutional privilege against self-incrimination.

In *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, the United States Supreme Court held that a police refusal to honor the defendant's request to consult with his lawyer during a custodial interrogation violated the defendant's sixth amendment right to the assistance of counsel. In *Escobedo* the defendant was arrested and taken to police headquarters. A lawyer retained to represent the defendant by the defendant's mother arrived shortly thereafter. When the lawyer attempted to see his client he was rebuffed both by the desk sergeant and by the homicide detectives who were interrogating the defendant. Several times the defendant asked the interrogating detectives whether he could see his lawyer, but each time the detectives told him that his lawyer did not want to see him. The defendant's eventual confession was admitted, and his motion to suppress was denied.

In *Escobedo*, the Supreme Court, basing its decision solely on the sixth amendment right to counsel, held that the defendant's confession should be suppressed where the suspect requests and has been denied an opportunity to consult with his lawyer, and where the police have not effectively warned him of his absolute constitutional right to remain silent. (378 U.S. 478, 491, 12 L. Ed. 2d 977, 986, 84 S. Ct. 1758, 1765.) However, the fact that the police had also denied the *lawyer's* requests to see his client did not pass unnoticed. The Court clearly stated that "it 'would be highly incongruous if our system of justice permitted the district attorney, the lawyer

representing the State, to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police.'" 378 U.S. 478, 487, 12 L. Ed. 2d 977, 984, 84 S. Ct. 1758, 1763, quoting *People v. Donovan* (1963), 13 N.Y.2d 148, 152, 193 N.E.2d 628, 629.

While *Escobedo* was partially superseded by the Supreme Court's decision in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Court clearly indicated that *Escobedo* retained independent significance. After summarizing the facts of *Escobedo*, the Court stated: "The police also prevented the attorney from consulting with his client. Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake." (384 U.S. 436, 465 n.35, 16 L. Ed. 2d 694, 718 n.35, 86 S. Ct. 1602, 1623 n.35.) Even in decisions later than *Miranda*, the Supreme Court continued to view *Escobedo* as a distinct holding, although it now viewed it as rooted in the fifth amendment privilege against self-incrimination rather than the sixth amendment right to counsel. See, *e.g.*, *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.

Given this background it is far from surprising that the vast majority of State courts examining this issue prior to *Burbine* held that a suspect's waiver of *Miranda* rights would not be valid if the police neglected or refused to inform the suspect that his attorney was attempting to assist him. See, *e.g.*, *Weber v. State* (Del. 1983), 457 A.2d 674; *Haliburton v. Florida* (Fla. 1985), 476 So. 2d 192; *State v. Matthews* (La. 1982), 408 So. 2d 1274; *Lodowski v. Maryland* (1985), 302 Md. 691, 490 A.2d 1228; *Commonwealth v. McKenna* (1969), 355 Mass. 313, 244 N.E.2d 560; *Lewis v. State* (Okla. App.

1984), 695 P.2d 528; *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272; *Commonwealth v. Hilliard* (1977), 471 Pa. 318, 370 A.2d 322 (plurality opinion); *Dunn v. State* (Tex. Crim. App. 1985), 696 S.W.2d 561; *State v. Jones* (1978), 19 Wash. App. 850, 578 P.2d 71.

The Illinois Supreme Court likewise held that "when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him." (*People v. Smith* (1982), 93 Ill. 2d 179, 189.) While the United States Supreme Court has now held that the Federal Constitution does *not* require the police to inform a suspect of an attorney's efforts to reach him, the Court carefully stated that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law." *Moran v. Burbine* (1986), 475 U.S. 412, 428, 89 L. Ed. 2d 410, 425, 106 S. Ct. 1135, 1145.

The majority declines to accept this invitation to read our State constitutional privilege (Ill. Const. 1970, art. I, §10) more broadly than the Federal privilege. This, of course, it is entitled to do. But I am troubled that the majority has not only declined to accept the invitation but has declined it in such peremptory fashion. Surely a question involving the interpretation of our own constitution by its ultimate arbiter deserves longer shrift.

I have already written at length on the basis for our right to give our State constitutional guarantees a more liberal interpretation than the corresponding guarantees in the Federal Constitution (*People v. Tisler* (1984), 103 Ill. 2d 226 (Clark, J., specially concurring)), and I see no need to repeat those arguments. But I do note that they have particular application to this case. It is one thing for us to seek guidance from the Supreme Court's con-

stitutional decisions when those decisions are predictable and consistent. It is another to follow blindly where the Court itself has retreated from positions previously taken.

As the foregoing demonstrates, *Moran v. Burbine* is not simply an application of long established principles. Instead, it is a significant shift in the direction of the Supreme Court's thinking, and a direct repudiation of its statements in *Escobedo* and *Miranda*. It was no accident that nearly every State, not excluding Illinois, read those statements to mean that the undisclosed denial of attorney access would render a *Miranda* waiver invalid. Indeed, *Burbine* arguably overrules *Escobedo*, since it deprives the case of any significance other than that of precursor to *Miranda*. More profoundly, *Burbine* transforms *Miranda* from the defendant's shield into the prosecutor's sword. The presence of *Miranda* warnings will now apparently excuse police conduct which many State courts (see, *e.g.*, *People v. Donovan* (1963), 13 N.Y.2d 148, 193 N.E.2d 628) found unacceptable even before *Miranda* was decided.

Given this history, it is incumbent upon us to undertake our own examination of whether denial of attorney access violates our State constitutional privilege against self-incrimination. For several reasons, I believe that it does.

First, while *People v. Smith* (1982), 93 Ill. 2d 179, did not mention the State Constitution as an alternate ground for its decision, it cited and discussed two cases which *did* rely on their own constitutions, *State v. Haynes* (1979), 288 Or. 59, 602 P.2d 272, and *State v. Matthews* (La. 1982), 408 So. 2d 1274. (See also *Lewis v. State* (Okla. 1984), 695 P.2d 528; *Dunn v. State* (Tex. Crim. App. 1985), 696 S.W.2d 561.) Indeed, this use of State constitutions was prominently mentioned in *Smith* itself. 93 Ill. 2d 179, 188.

Second, since *Burbine* was decided, at least one State court has declined to follow it, holding that its own privilege against self-incrimination affords defendants greater protection. *People v. Houston* (1986), 42 Cal. 3d 595, 724 P.2d 1166, 230 Cal. Rptr. 141.

Third, article I, section 10, of the Illinois Constitution of 1970 was adopted during a high-water mark of political liberalism, prior to *Burbine.* To say that *Burbine* must determine our interpretation of our own constitution is, therefore, to credit those who ratified it with clairvoyance. Moreover, our constitution was adopted after *Escobedo* and *Miranda*, at a time when the United States Supreme Court itself had indicated that preventing an attorney from seeking his client violated the Federal Constitution, and when all State courts held the same. Interestingly, the committee presentation on section 10 was given to the 1970 constitutional convention by Bernard Weisberg, who had argued *Escobedo* for the defendant. (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1376-77.) He, and the other members of the committee, could not have been unaware of the decision in that case.

Finally, and most importantly, there are strong policy reasons for holding that a defendant should be informed of his attorney's attempts to see him. In general, the State bears the burden of proving that a waiver of constitutional rights is valid. (See, *e.g., Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) An attorney's communication to the police about his client is an event which has a direct bearing upon whether a waiver is knowing or intelligent. For, "[t]o pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react

quite differently to the second." (*State v. Haynes* (1979), 288 Or. 59, 72, 602 P. 2d 272, 278.) It is significant that the American Bar Association filed an *amicus* brief on the defendant's behalf in *Burbine*, and that the ABA standards for criminal justice mandate that a lawyer be allowed to see his client. (ABA Standards for Criminal Justice §§5—5.1, 5—7.1 (2d ed. 1980).) Beyond this, acceptance of *Burbine* would seem to lead to the proposition that the police have an absolute right to hold suspects *incommunicado*.

I also cannot accept the majority's attempt to distinguish between personal visits and telephone calls. While it is true that *Smith* involved an attorney who appeared at the station house, the court in *Smith* favorably cited two cases, *State v. Matthews* (La. 1982), 408 So. 2d 1274, and *State v. Jones* (1978), 19 Wash. App. 850, 578 P.2d 71, which did involve telephone calls. Nor should the manner of attempted communication make any difference. In an age of modern transportation and communication, an attorney who telephones is very nearly as "available" to speak with the defendant as an attorney who has actually arrived at the station house. In any case, I note that the majority's attempt to distinguish *Smith* preserves for later consideration the issue of whether our State Constitution grants a broader privilege against self-incrimination in cases where the attorney is actually present.

JUSTICE SIMON, dissenting:

"Confessions of the accused are among the most powerful weapons employed in the prosecution of crimes. Nothing else can equal the impact upon the fact finder of an apparent admission of guilt by the party charged." (2 J. Cook, Constitutional Rights of the Accused 21 (2d ed. 1986); *People v. Prohaska* (1956), 8 Ill. 2d 579, 585 (confession of guilt is evidence of a "high and convincing

character").) Therefore, courts must endeavor to ensure that confessions that reach the jury are reliable and voluntary products of police investigation and interrogation. The procedures used by the police in this case to obtain defendant's confession—physical force, misrepresentation, and separation of counsel and client—undermine the reliability of the resulting confession and are impermissible under both State and Federal law. The trial court's failure to suppress the resulting nonvoluntary confession constitutes error entitling defendant to a new trial. In addition, because all prospective black jurors were kept from service on the jury through the State's use of peremptory challenges, defendant is entitled at the very least to a hearing on whether those jurors were unconstitutionally excluded from the jury which convicted him in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. See also *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (*Batson* applies retroactively to cases where the conviction had not become final before the new rule was announced).

A review of the circumstances surrounding defendant's confession to the Des Plaines police reveals three factors which combined to induce defendant's involuntary confession: physical injuries suffered by defendant while in the custody of the Schiller Park police, misrepresentations made to defendant by the Des Plaines police in order to induce defendant to confess, and the separation of defendant and his attorney during the period of police interrogation. I will address each of these factors separately.

At the suppression hearing, defendant testified that he was beaten by Schiller Park police. He described two episodes of brutality in which he was kicked, hit, and knocked to the ground, punched and beaten with a nightstick, raised off the floor by elevating his handcuffed

arms behind him, and his hair was pulled. Defendant testified that as a result he suffered pain in his ribs and in his right knee, and that he lost tufts of hair. Defendant's claims of mistreatment were corroborated by his attorney's testimony that at their first meeting defendant told him that he had been beaten and showed the attorney his visibly injured knee. Defendant received no medical treatment for his injuries while at the Schiller Park or Des Plaines police stations on the day of his interrogation and confession. After a medical examination at Cermak Hospital the following day, defendant was informed that he probably had fractured ribs in the midchest area, advised to treat his injured knee with sitz baths, and given pain medication. After hearing all the evidence at the suppression hearing, the trial judge determined that the "apparently very severe physical confrontation" between defendant and the police warranted suppression of inculpatory statements made by defendant at the Schiller Park police station. The trial judge declined to suppress statements made at the Des Plaines station, however, in part because no additional physical cruelty was proven to have been exerted against defendant in Des Plaines.

It is axiomatic that confessions obtained through physical brutality or force may not be used as evidence to secure a conviction against the accused. (*Brown v. Mississippi* (1936), 297 U.S. 278, 285-86, 80 L. Ed. 682, 687, 56 S. Ct. 461, 464-65; *People v. O'Leary* (1970), 45 Ill. 2d 122, 125; *People v. Davis* (1966), 35 Ill. 2d 202, 205; *People v. Cunningham* (1964), 30 Ill. 2d 433, 436; *People v. Prohaska* (1956), 8 Ill. 2d 579, 585; *People v. Davis* (1948), 399 Ill. 265, 271.) In addition, brutality may render inadmissible not only inculpatory statements made by the accused during the beating or mistreatment, but also statements made later which are deemed to be tainted by the earlier brutality. *People v. Thomli-*

*son* (1948), 400 Ill. 555; *People v. Santucci* (1940), 374 Ill. 395.

Here, the defendant confessed within approximately six hours of sustaining significant injuries while in the custody of the Schiller Park police. When asked "Did you confess because *** you were hurt?" the defendant replied, "Yes, I wanted people to just leave me alone." That defendant suffered no additional physical brutality at the Des Plaines station (a fact which defendant disputes) does not vitiate the physical coercion to which defendant had already been subjected, especially because at the time of his confession defendant had received no medical treatment for his injuries. In view of these circumstances, the numerous *Miranda* warnings defendant received before confessing, and his experience in dealing with the police, could not cure the coercive effect of the actions of the Schiller Park police. Therefore, defendant's Des Plaines confession was tainted by the physical confrontation in Schiller Park, and the trial court erred in concluding that the confession was admissible.

The majority's suggestion that "there can be no coercion available to infect [defendant's statements]" in the "absence of an affirmative finding of physical coercion" (121 Ill. 2d at 157) is not accurate. Here, it is uncontroverted that defendant sustained numerous injuries while in the hands of Schiller Park police. The trial court's finding that a "very severe physical confrontation" had taken place necessarily includes a finding of coercion; otherwise, the trial court would not have suppressed defendant's statements. In this light, the majority's insistence on an "affirmative finding" of brutality is little more than a semantic game.

The second factor which rendered defendant's confession inadmissible is the subterfuge used by the Des Plaines police to coerce defendant into confessing. Officer Meese of the Des Plaines police admitted at trial that

he made untrue statements to defendant during the interrogation which led to defendant's confession. Specifically, Meese told defendant that the Des Plaines police had received a report identifying his car at the scene of the crime:

> "At that time I indicated to him that we were notified by the City of Chicago that his vehicle was observed in the alley involved in a rape incident, and that he could not be identified, but that he would have to explain why the vehicle was there."

Meese's misrepresentation achieved its desired result. Although defendant had already given a statement denying involvement in the crime, defendant gave another statement following Meese's subterfuge in which he confessed.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629, the United States Supreme Court stated that:

> "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver [of the fifth amendment privilege against self-incrimination] will, of course, show that the defendant did not voluntarily waive his privilege."

(See also *Moran v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141 (relinquishment of *Miranda* rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"); see, *e.g., People v. Hogan* (1982), 31 Cal. 3d 815, 647 P.2d 93, 183 Cal. Rptr. 817 (confession inadmissible due to misrepresentation); *State v. Howard* (Tenn. Crim. App. 1981), 617 S.W.2d 656 (same); *Commonwealth v. Meehan* (1979), 377 Mass. 552, 387 N.E.2d 527 (same).) In assessing whether misrepresentation renders a defendant's confession involuntary and therefore inadmissible this court has applied a totality-of-circumstances test. Under this test misrepresentation is only a factor

to be considered, along with "age, education and intelligence of the accused, the duration of questioning, and whether he received his constitutional rights or was subjected to any physical punishment." *People v. Kashney* (1986), 111 Ill. 2d 454, 466-67, quoting *People v. Martin* (1984), 102 Ill. 2d 412, 427.

Applying this test to the facts in this case compels the conclusion that defendant's confession was inadmissible. Not only had the defendant been subjected to severe physical brutality, but also he was kept *incommunicado* from his attorney in violation of his constitutional rights. In addition, defendant had been in police custody since early that morning and had been questioned by two different police departments and at least two assistant State's Attorneys. The fact that defendant had received repeated *Miranda* warnings is of little significance in the face of these coercive conditions and the extended interrogation to which the defendant was subjected.

Based on its reading of *Spano v. New York* (1959), 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202, and *Lynumn v. Illinois* (1903), 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917, the majority concludes that the subterfuge employed by Officer Meese did not coerce the defendant's confession because it was "not employed to suggest that the defendant would suffer physical, emotional, or material harm" or that "the defendant or a loved one would be harmed in some way" if the defendant refused to confess. (121 Ill. 2d at 155.) This is an overly narrow reading of *Lynumn* and *Spano*; these cases did not establish a requirement that the defendant or his loved ones be directly threatened with harm before a misrepresentation can be deemed to have a coercive effect powerful enough to invalidate defendant's confession. Instead, the central inquiry under *Spano* and *Lynumn* is whether, considering the totality of circumstances, the defendant's will was overborne by the tech-

niques employed by the police in obtaining the confession. (*Spano*, 360 U.S. at 323, 3 L. Ed. 2d at 1271-72, 79 S. Ct. at 1207; *Lynumn*, 372 U.S. at 534, 9 L. Ed. 2d at 926, 83 S. Ct. at 920.) Under this approach, defendant need not establish threats of the same directness or magnitude as those in *Spano* or *Lynumn* in order to establish that his will was overborne. Here, the effect of the officer's subterfuge, which falsely implied that the police had eyewitness evidence against defendant, must be judged in light of the facts that defendant was suffering physical injuries and had already been interrogated and given an exculpatory statement. Under these circumstances, defendant's confession cannot be characterized as " 'the product of a rational intellect and a free will.' " *Lynumn*, 372 U.S. at 534, 9 L. Ed. 2d at 926, 83 S. Ct. at 920, quoting *Blackburn v. Alabama* (1963), 361 U.S. 199, 208, 4 L. Ed. 2d 242, 249, 80 S. Ct. 274, 280; *People v. Kincaid* (1981), 87 Ill. 2d 107, 117.

Even before the United States Supreme Court announced its decision in *Miranda v. Arizona* prohibiting trickery in obtaining confessions, this court had denounced the use of trickery and falsehood to coerce a defendant's confession. (See *People v. Stevens* (1957), 11 Ill. 2d 21, 27.) We should continue to denounce and deter these practices by rendering the fruit of such tactics inadmissible, especially where, as here, defendant's confession was elicited through knowing and deliberate misrepresentation by the police with the specific intent to induce defendant's confession. See *Spano*, 360 U.S. at 324, 3 L. Ed. 2d at 1272, 79 S. Ct. at 1207 (where an "undeviating intent of the officers to extract a confession *** is shown *** the confession obtained must be examined with the most careful scrutiny"); see also *People v. Kashney* (1986), 111 Ill. 2d 454, 467 (Goldenhersh, J., concurring in part and dissenting in part) (contending that use of deceptive practices by the police in obtaining

confessions violates *Miranda*); *People v. Martin* (1984), 102 Ill. 2d 412, 429 (Goldenhersh, J., dissenting) (same).

The third factor which indicates that defendant's confession was improperly obtained and should be suppressed is the way in which the defendant was kept *incommunicado* from his attorney. I agree with Chief Justice Clark's analysis of this issue in the specially concurring opinion, and thus will not repeat those arguments here. I disagree with the special concurrence, however, on two points. First, there was sufficient evidence to establish that defendant's attorney requested access to defendant during the interrogation period. Defendant's wife testified at the suppression hearing that the attorney had attempted to contact the defendant. Also, although the attorney's closing statement in the suppression hearing (in which he detailed his attempts to contact defendant) was not sworn testimony, as an officer of the court the attorney was under a continuing ethical duty to speak truthfully, and we have no reason to doubt his veracity. Furthermore, the trial court recognized that he was introducing facts in his closing not presented in testimony, but allowed him to continue over the State's objection. Under these circumstances the attorney had every reason to believe his statement was being accepted by the court as the functional equivalent of testimony, and I would regard the statement as such. His attempts to contact his client were also enumerated in the written motion to suppress defendant's confession filed before the suppression hearing. Moreover, as the appellate court noted, the testimony of the officer who claimed that the attorney had not requested access to the defendant had been severely discredited.

Second, because of a critical factual difference between this case and *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, I am not convinced that *Burbine* controls the result here under Fed-

eral law. In *Burbine,* the defendant never expressed any desire for an attorney. The Court repeatedly noted the significance of this factor in its decision: "At no point during the course of the investigation *** did [defendant] request an attorney *** he '[did] not want an attorney called or appointed' *** he had access to a telephone, which he apparently declined to use *** he at no point requested the presence of a lawyer." (475 U.S. at 415, 417-18, 420, 89 L. Ed. 2d at 417, 418, 420, 106 S. Ct. at 1138, 1139, 1141.) The Court also reiterated the *Miranda* requirement that "[i]f the individual indicates *in any manner,* at *any time prior to* or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." (Emphasis added.) (475 U.S. at 420, 89 L. Ed. 2d at 420, 106 S. Ct. at 1141, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.

In the present case it is undisputed that a Schiller Park police officer called defendant's wife from the station and discussed defendant's arrest and bail with her. The officer then put defendant on the line, at which time defendant instructed his wife to retain a specific attorney in his behalf. Thus, in this case, unlike *Burbine,* it is uncontested that defendant had actively sought the advice and counsel of an attorney prior to interrogation and confession. Defendant in this case, unlike the defendant in *Burbine,* had every expectation that an attorney would be contacting him. Defendant was persuaded to confess only after the police had successfully kept the defendant and his attorney separated prior to and during the interrogation period. Perhaps defendant lost hope that the attorney would actually appear for his defense, or without the benefit of counsel simply gave in to the pressure to confess exerted by his interrogators.

Also, the Court in *Burbine* noted as significant that there was no evidence of physical coercion, and that the defendant initiated the confession conversation. In contrast, defendant in the present case had been physically injured at the hands of police only a few hours earlier, and had already been subjected to repeated interrogation initiated by the police before he confessed. I would hold, therefore, that because of the critical factual differences between *Burbine* and the present case, *Burbine* does not control the result in this case. We should look to the United States Supreme Court's earlier statements in *Miranda* and *Escobedo*, as discussed in the special concurrence, for the resolution of the separation of attorney and client issue. See, *e.g., Miranda*, 384 U.S. at 476, 16 L. Ed. 2d at 724-25, 86 S. Ct. at 1629 ("Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights").

In sum, it is clear that the combined conduct of the Schiller Park and Des Plaines police in this case rendered defendant's confession involuntary and that the confession therefore should be suppressed. In the words of Chief Justice Earl Warren:

> "The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."
> *Spano v. New York* (1959), 360 U.S. 315, 320-21, 3 L. Ed. 2d 1265, 1270, 79 S. Ct. 1202, 1205-06.

Even if defendant's confession could be deemed voluntary and admissible, defendant's conviction is still

drawn into question by the State's use of peremptory challenges to exclude black persons from the jury. Two black potential jurors, the only black persons on a venire of 40 people, were eliminated by the State through the exercise of its peremptory challenges, resulting in an all-white jury. Defendant contends that the exclusion of black persons from the jury violated his fourteenth amendment right to equal protection of the laws and his right to a jury selected from a representative cross-section of the community under the sixth amendment. The majority concludes that defendant does not have standing to assert a *Batson* violation on equal protection grounds because he is white and the excluded prospective jurors are black, and dismisses defendant's sixth amendment argument as precluded by this court's earlier rulings.

Even if *Batson* forecloses challenges to the discriminatory use of peremptory challenges under an equal protection analysis when the defendant is not a member of the class excluded from the jury, it in no way endorses the continued discriminatory exclusion of black people from juries. The *Batson* Court noted that the use of peremptory challenges to exclude black persons was impermissible based on three factors: harm to the defendant, harm to the juror, and harm to the community. Minorities, according to the Court, have an interest independent from the defendant's in serving as jurors:

> "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. *** A person's race simply 'is unrelated to his fitness as a juror.' [Citation.] As long ago as *Strauder*, therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror." (*Batson*, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1717-18.)

The community also has an interest in preventing discriminatory exclusion from jury service:

"The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. *Batson*, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718.

The Supreme Court used sweeping language throughout *Batson* in renouncing as unconstitutional exclusion of black persons from the jury, evincing a commitment to prohibit discriminatory exclusion tactics in their entirety: "the Constitution prohibits *all forms* of purposeful racial discrimination in the selection of jurors." (Emphasis added.) (476 U.S. at 88, 90 L. Ed. 2d at 82, 106 S. Ct. at 1718.) The Court noted that in many State and Federal courts "the [peremptory] challenge may be, and unfortunately at times has been, used to discriminate against black jurors," and concluded that "[i]n view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race." 476 U.S. at 99, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724.

Furthermore, the *Batson* Court made clear that the prohibition against discriminatory tactics now applies not only to the selection of the jury panel or venire, but equally to the selection of the petit jury. "While decisions of this Court have been concerned largely with discrimination during selection of the venire, *the principles announced there also forbid discrimination on account of race in the selection of a petit jury.*" (Emphasis added.) (476 U.S. at 88, 90 L. Ed. 2d at 82, 106 S. Ct. at 1718.) Thus, fair venire selection is only the threshold requirement for properly selecting a jury. The State cannot be

allowed, after seating a proper venire, to pervert the jury selection process by using peremptory challenges to ensure that minorities are kept off the jury. *Batson*, 476 U.S. at 88, 90 L. Ed. 2d at 82, 106 S. Ct. at 1718 ("the State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at 'other stages in the selection process' ").

A logical extension of the language in *Batson* would prevent exclusion of black people from the jury through the use of peremptory challenges regardless of whether the defendant is a member of the excluded class, based on the juror's and the community's independent interests in a fairly selected jury, as well as the defendant's interest. Defendant has suggested the proper rationale for the extension of the principle: defendant's sixth amendment right to a representative cross-section of the community on the jury. A sixth amendment challenge is particularly appropriate in the present case, where the defendant is white and the excluded jurors are black, because a defendant need not be a member of the excluded class in order to raise a fair cross-section challenge. *Duren v. Missouri* (1979), 439 U.S. 357, 359 n.1, 58 L. Ed. 2d 579, 583 n.1, 99 S. Ct. 664, 666 n.1; *Peters v. Kiss* (1972), 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163 (white defendant could raise sixth amendment claim based on the exclusion of blacks).

Under the sixth amendment, a defendant is entitled to a fair cross-section of the community on the jury. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692.) This has been interpreted to guarantee that the jury venire be selected in a nondiscriminatory manner from a source fairly representative of the community, even though *Taylor* does not go so far as to guarantee a representative petit jury. But as already mentioned, *Batson* has added an additional dimension to this analysis: although a petit jury selected from a

proper panel need not necessarily reflect a cross-section of the community, discriminatory tactics designed to manipulate the ultimate composition of the petit jury will no longer be tolerated. As the United States Court of Appeals for the Second Circuit phrased it in *Roman v. Abrams* (2d Cir. 1987), 822 F.2d 214, 226, 229:

"[T]he sixth amendment guarantees only the *possibility* of a petit jury reflecting a cross section of the community and forbids the prosecutor to exercise his peremptories discriminatorily in a manner that eliminates that possibility *** [W]hat the sixth amendment guarantees to a defendant is not that he will have a petit jury of any particular composition but that he will have the *possibility* of a jury that reflects a fair cross section of the community. The prosecutor violates sixth amendment rights when he starts out to eliminate that possibility." (Emphasis in original.)

The *Roman* court also articulated the *prima facie* showing that should be required for a defendant to establish a violation of the sixth amendment right to the possibility of a fair cross-section on the petit jury. To establish a *prima facie* case, a defendant must show that " '(1) the group alleged to be excluded is a cognizable group in the community, and (2) there is substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venireperson's group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.' " *Roman,* 822 F.2d at 223, 225, quoting *McCray v. Abrams* (2d Cir. 1984), 750 F.2d 1113, 1131-32.

I raised an argument challenging the use of discriminatory peremptory challenges in the selection of petit juries as violative of the sixth amendment fair cross-section requirement, as well as arguments that such challenges are forbidden under our State constitution and

that this court should exercise its supervisory authority to ensure that discriminatory tactics are not successful in *People v. Payne* (1983), 99 Ill. 2d 135, 140 (Simon, J., dissenting). I will not repeat those arguments here except to note the effect that *Batson* has on this court's prior decisions rejecting a sixth amendment prohibition on the discriminatory use of peremptory challenges.

In the wake of *Batson*, nothing precludes this court from holding that the use of peremptory challenges to exclude black jurors, even where the defendant is not black, violates the fair cross-section requirement of the sixth amendment. The opinions relied on by the majority—*People v. Payne* (1983), 99 Ill. 2d 135, *People v. Williams* (1983), 97 Ill. 2d 252, and *People v. Gaines* (1984), 105 Ill. 2d 79—were based on precedent that has now been overturned. In those cases defendants argued that use of peremptory challenges to exclude black people from the jury violated both their fourteenth amendment rights to equal protection and their sixth amendment right to a fair cross-section of the jury. In support of their sixth amendment arguments, the defendants relied on *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, in which the United States Supreme Court held that the sixth amendment right to a jury trial includes the right to have a petit jury selected from a representative cross-section of the community. In all of those cases, however, this court held that an earlier Supreme Court case, *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, must be read into *Taylor* and therefore that *Swain* controlled the resolution of the peremptory challenge issue under a sixth amendment analysis. Under *Swain*, an equal protection case, to establish discrimination in the use of peremptory challenges, a defendant was required to demonstrate systematic and purposeful exclusion of minorities in case after case. *Swain* has now been overruled by *Batson*,

thereby calling into question the holdings in those cases relying on *Swain,* including *Payne, Williams,* and *Gaines.* Thus, this court writes on a clean slate, and it would be incongruous for this court not to read the *Batson* decision into the sixth amendment analysis of *Taylor*—thereby prohibiting the use of peremptory challenges to exclude black persons from petit juries under the sixth amendment—after insisting for so long on reading *Swain* into *Taylor.*

It is not our concern to ponder the motivation for the State's attempt to exclude black persons from the jury in a particular case when the defendant is not black, but simply to ensure that it is not successful in doing so. Discrimination against black people is no less reprehensible simply because the defendant happens to be white. As acknowledged by the Supreme Court in *Batson,* black persons have an interest in serving as jurors independent from and in addition to the right of the defendant to a jury selected in a nondiscriminatory manner from a representative cross-section of the community, and interference with these rights should not be tolerated by this court for any reason.

In view of the long and unjustifiable history in this State of exclusion of black persons from jury service through the use of peremptory challenges (see *People v. Lewis* (1984), 103 Ill. 2d 111, 122 (Simon, J., dissenting) (listing cases in which peremptory challenges were used to exclude potential black jurors); *People v. Payne* (1983), 99 Ill. 2d 135, 152 (Simon, J., dissenting) (same)), I urge this court not to wait until the United States Supreme Court explicitly denounces the use of peremptory challenges to exclude minorities from the jury where the defendant is a nonminority, but instead to take the initiative, under the unequivocal condemnation of such procedures in *Batson,* in outlawing all discrimination against black persons in the jury selection system in this State.

188

Some post-*Batson* courts have already held that discriminatory use of peremptory challenges is prohibited under the sixth amendment. See, *e.g., Roman v. Abrams* (2d Cir. 1987), 822 F.2d 214; *Booker v. Jabe* (6th Cir. 1986), 801 F.2d 871; *Fields v. People* (Colo. 1987), 732 P.2d 1145.

At the very least this matter should be sent back to the trial court for a hearing to determine whether black persons were improperly excluded from service on the jury. For these reasons I respectfully dissent.