(No. 25271.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* TONY SANTUCCI, Plaintiff in Error.

*Opinion filed October 11, 1940.*

CHARLES A. BELLOWS, (J. W. BELLOWS, of counsel,) for plaintiff in error.

JOHN E. CASSIDY, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, BLAIR L. VARNES, and JULIUS L. SHERWIN, of counsel,) for the People.

Mr. CHIEF JUSTICE JONES delivered the opinion of the court:

Tony Santucci, John DeBartello and Sam Bakos were indicted in the criminal court of Cook county for robbery

while armed with a dangerous weapon. Bakos was granted a severance and on the trial testified in behalf of the People. A jury found Santucci and DeBartello guilty as charged and judgment was rendered on the verdict. Santucci, alone, (hereinafter referred to as the defendant,) prosecutes this writ of error.

On May 6, 1938, shortly after 4:00 A. M., two men entered the Buena-Oaks Hotel, 4301 Broadway, in Chicago, one of them carrying a suitcase, and asked for a room. Delman E. Foley, the clerk, replied that none was available. The second stranger, identified as DeBartello, brandished a revolver and his associate jumped over the counter, searched Foley's clothing and rifled the drawer of the desk, taking thirty-nine dollars, some stamps and telephone slugs. A guest of the hotel, Margaret Rosebrough, employed in the mail-opening department of Montgomery Ward and Company, witnessed the robbery as she was making her regular departure for work, her hours commencing at any time after 5:10 A. M. Two more men had entered the hotel in the meantime, and one of them stopped her and told her to go back. She was taken to the office door and commanded to go inside and to remain quiet. Foley and Miss Rosebrough were pushed into and locked in the inner office. After the robbers departed, Foley crawled out the window, came in the front entrance of the lobby, called the hotel manager and telephoned' the police. Officers Joseph Seebacher and James O'Neil responded to the call fifteen or twenty minutes later. Seebacher testified that he arrived about 4:25 o'clock and as Foley described two of the four men to him Miss Rosebrough was talking to O'Neil. From O'Neil's testimony it appears that he talked with both witnesses, and that Foley said he could identify each of the four intruders if he saw them again and gave a detailed description of two of them which he, O'Neil, incorporated in a written report. The description of these two men admittedly does not fit defendant. According to Miss Rose-

brough she furnished the officers descriptions of the four men, describing the defendant as short, about five feet four or five inches, nineteen or twenty years of age, dark brown hair, medium build and weighing about 150 pounds. She did not know, however, whether the police wrote down this description. After the robbery she did not see defendant until the trial, when he was in the custody of the officers. On the witness stand she identified him as one of the robbers. Foley, on cross-examination, was unable to state what description of the four men he gave the police, except that he said the man with the gun wore a brown suede jacket. He admitted that he was under a tremendous excitement which impaired his ability to observe. In his motion to reopen the People's case after it had been closed, the assistant State's attorney gave as his reason that Foley had not stood up on cross-examination as he might have been expected to. Tom DeBartello, Bakos and John DeBartello were apprehended in succession on September 8, 1939. Defendant was arrested the next day, September 9, about 8:00 A. M., and taken by officers Charles Todd and Chester Dejeske to the thirty-fourth district or Albany Park police station, arriving thirty minutes later. Foley appeared at 10:00 A. M. and recognized defendant, John DeBartello, and Bakos in a review of ten or twelve persons. He did not identify Tom DeBartello.

After the People had been permitted to reopen the case, Sam Bakos was called as a witness and testified, in effect, that John DeBartello, Tom DeBartello, the defendant and himself met at the corner of Austin and Irving Park boulevards about 3:30 or 4:00 o'clock in the morning of May 6; that they proceeded to the Buena-Oaks Hotel in Tom De-Bartello's automobile; that five minutes after Tom and John DeBartello went into the hotel he and the defendant entered; that he went up to the desk and defendant, who stood by the door, approached Margaret Rosebrough as she was coming down the stairs, announced a "hold-up" was

in progress and ordered her to go back; that John DeBartello placed Foley and the young woman in the wash room; that he, Bakos, took thirty dollars and some stamps from the desk, after which they drove away and divided the money. The witness also testified that at the show-up at the police station on September 9, Foley pointed out the defendant and himself, identified them as the men who held him up, and that each of them confirmed his statement. Bakos stated, on cross-examination, that he and defendant were called into the State's attorney's office together and were asked "which one was going to turn State's evidence," and that Bakos later decided to. He denied that he had been promised immunity or leniency, but said he was hoping for the best and his testimony was given "in that light, that I am hoping for the best." At the time of this trial he had pleaded guilty, and was afterwards placed on probation.

The defendant at the time of the trial was nineteen years of age, five feet three inches tall. He denied participation in the robbery. His father, his mother and an older brother each testified that he was at home in bed at the time the offense was perpetrated.

Over the objection of defendant on the ground it was obtained by duress, the court admitted in evidence an oral statement attributed to defendant. Error is assigned on this ruling. It appears from the evidence that about 2:00 o'clock on the morning of September 6, three days before he was arrested on the charge of robbery, defendant and several others were at a pool room observing exhibition shots by an expert, when two policemen walked in. They told all present they could go home and ordered defendant to go home. None of the men were committing a crime or being disorderly and no reason appears for this action of the policemen. When defendant reached the sidewalk in front of the pool room, he saw a third policeman. Defendant started walking in the opposite direction from his home,

and when the police pointed out this fact to him, defendant stated he was going to get something to eat first. Thereupon the three policemen grabbed him and a struggle ensued. Defendant and another witness testified the policemen beat defendant severely and finally hit him on the head, knocking him through a window and rendering him unconscious. Each policeman was about six feet tall and weighed over two hundred pounds. All three policemen denied beating defendant or that he was injured, to their knowledge. However, the inescapable conclusion is that defendant was severely beaten. He was taken to the Gale avenue police station and that morning sent to the Bridewell county hospital, where he remained a day and a half. He was released about 10:00 o'clock on the morning of September 8 without any charge ever having been made against him. About 2:00 o'clock that afternoon defendant, accompanied by his father, went to the office of Dr. A. G. Jones. Dr. Jones examined him and testified he found numerous bruises and contusions on his body, and that he was suffering from a concussion of the brain. He advised defendant to go to bed and rest. Defendant testified that instead of going home he went to his sister's, owing to his fear of the officers. As soon as he arrived, he went to bed. About 8:00 o'clock the next morning three officers arrested him at his sister's home and took him to jail dressed only in his underwear. According to defendant's testimony, after they were at the jail and while he was dressing, officer Todd asked him about a robbery at the "Oaks" and defendant said he didn't know what Todd was talking about. Todd hit him once in the stomach and said that if he did not tell he would get another beating like the one he received a few nights before. He then admitted he was present at the robbery, but at the trial testified it was not true and that he made the admission because of fear of receiving another beating. Officers Todd and Dejeske de-

nied that any force or threats of force were used to obtain the admission, but their stories vary somewhat. Todd testified he asked defendant if he knew the other fellows were arrested and defendant replied he had heard it. Todd asked defendant if he knew he was the other one who was accused and defendant said "Yes." Todd asked, "Were you?". and defendant replied, "Well, what do they say?" Todd told him they said he was, and defendant said, "Well, then I was." Todd testified he did not reduce this to writing or attempt to obtain a written statement—that he did not want to get a written statement from him, but only an admission. According to officer Dejeske, Todd asked defendant if he knew the others had been arrested and defendant said he did not. Todd told him they had been and were in the same jail, and then asked defendant if he participated in the robbery. Defendant asked what the others had said, and when told they had said he had, stated, "If they said so, they ought to know."

The first question presented for our consideration is whether the court erred in admitting evidence of the oral statement of defendant. The rule is that such statements are not admissible unless voluntarily made. (*People* v. *Spranger,* 314 Ill. 602.) We are convinced from the evidence above recited that defendant made the statement because of fear of receiving further physical mistreatment if he denied his guilt. It is true, as the People point out, that at the time defendant was first brutally assaulted, three days before his arrest on the robbery charge, he was not interrogated about the robbery. It does not follow, however, that the evidence of that mistreatment is entitled to no weight in determining whether the statement three days later was voluntarily made. This beating was administered by three police officers of the city of Chicago, each much larger than defendant, an eighteen-year old boy, and was wholly unwarranted. It was so severe that at the time of his arrest

his body was still badly bruised and he was suffering from a concussion of the brain. He was arrested and taken from his bed, where he was ordered by Dr. Jones to be, and taken practically unclothed to jail. After such abuse by policemen when they had no charge against him, it is obvious defendant would in all probability be afraid to invite the hostility and wrath of the officers by insisting he was innocent when arrested on the robbery charge. He testified officer Todd threatened him with a repetition of that mistreatment and punched him in the stomach. This is denied by officers Todd and Dejeske, but their accounts of the conversation differ. And it is unusual that Todd testified he did not want a written statement but only an admission. The tenor of the oral statement tends to indicate that defendant was merely failing to deny the accusations of his guilt rather than affirmatively admitting his guilt. If he were voluntarily confessing, it seems likely he would have made his statements more positive. We conclude this oral statement was made under duress and not voluntarily, and that the court erred in admitting it in evidence. For that reason the judgment must be reversed.

Defendant argues that the court erred in refusing to admit in evidence a report written by officer O'Neil a few minutes after the robbery containing a description given by Foley of two of the four robbers. The descriptions do not describe defendant. No error was committed, for O'Neil was permitted to state the contents of the report and to read from it the descriptions it contained.

The other alleged errors are not likely to recur on another trial of this cause, and need not be discussed.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*