UNITED STATES of America ex rel. Daniel HOLLAND, Petitioner,

v.

Kenneth McGINNIS, Director of the Illinois Department of Corrections, Respondent.

No. 90 C 04359.

United States District Court, N.D. Illinois, E.D.

Dec. 18, 1990.

Motion to Alter or Amend Denied Feb. 12, 1991.

Donald Honchell, Cook County Public Defender, Chicago, Ill., for petitioner.

Jack Donatelli, Terrence Madsen, Asst. Attys. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On May 4, 1980, Daniel Holland abducted a suburban female teenager and, at knifepoint, sexually assaulted her. A Cook County, Illinois circuit court jury subsequently found him guilty of rape, deviate sexual assault, aggravated kidnapping, and armed robbery. Holland now seeks habeas relief under 28 U.S.C. § 2254 (1988), challenging the state's use of peremptory challenges at trial and, additionally, alleging both physical and mental coercion in violation of the Fifth Amendment. For the reasons set forth below, we grant his petition.

### I. Factual and Procedural Background

The facts underlying Holland's conviction can be briefly set forth:

[O]n May 4, 1980, at approximately midnight, the complainant and her boyfriend left a party, riding in her boyfriend's car. The complainant drove. The car suddenly had a flat tire and the complainant pulled the car over to the shoulder of the road. They discovered that the spare tire was also flat. After waiting an hour for assistance, the couple decided to sleep in the car. They awakened at dawn and began to walk on the shoulder of the road. Shortly afterward, defendant [Holland] pulled up in his car, asked what was wrong, and offered to give the complainant and her boyfriend a ride home. Accepting the invitation, the couple got in defendant's car. The complainant sat in the front seat and her boyfriend sat in the back seat.

After driving for a while, defendant pulled off the road and stopped the car, he grabbed the complainant, brandished a knife against her throat, ordered the boyfriend to get out of the car, and threatened to kill them if the boyfriend did not do so. The complainant's boyfriend got out of the car. The complainant pleaded with the defendant to release her. The defendant said he would let her go when he was through with her. He

pulled her nearer to him and continued driving while holding the knife under the complainant's arm. Defendant then pulled his car into a parking lot. The complainant was ordered to take off her clothes or get "cut up." As the complainant disrobed, the defendant cut her brassiere and forced her to perform an act of oral copulation.

During this ordeal, defendant complained that the complainant was not sexually performing the way he wanted and he cut the complainant's upper thigh with his knife. The complainant testified that the defendant threatened to kill her if she did not do what he wanted. They got back in the car.

The defendant continued driving. The defendant then pulled into an alley where he and the complainant again got out of the car. The defendant forced the complainant to have intercourse with him twice and to perform oral copulation on him. The complainant testified that she did not attempt to leave nor did she cry out for help because she was only partially clothed. The defendant took the complainant's money (approximately $60), driver's license and school identification card and threatened to kill her if she reported the incident to the police. The defendant then allowed the complainant to get dressed outside the car and leave. The complainant testified that as she walked away she turned and noticed that the defendant's car did not have a rear license plate. The complainant ran to a grocery store where she used the washroom and called home. Her brother came to pick her up and immediately drove her to a police station. After reporting the incident to the police, the complainant was taken to a hospital. From the hospital, the complainant was driven to the places she had been taken by the defendant and then went back to the police station where she identified the defendant's picture from a group of photographs.

During the time the complainant was with the defendant, the complainant's boyfriend called the police. The police radioed a description of the defendant and the type of car he was driving. Defendant was arrested at about 8:15 a.m. when he was stopped by the police for driving without a rear license plate. The defendant did not have a valid driver's license. He was taken to the Schiller Park police station where a hunting knife, the complainant's high school identification card and $58.80 were taken from him.

*People v. Holland*, 147 Ill.App.3d 323, 324–26, 100 Ill.Dec. 868, 870–71, 497 N.E.2d 1230, 1232–33 (1st Dist.1986).

The Illinois Appellate Court reversed Holland's conviction. It found, among other things, that: (1) failure of the police to notify Holland that his attorney had attempted to reach him invalidated Holland's purported waiver of the right to counsel (*id.* at 336, 100 Ill.Dec. at 877–78, 497 N.E.2d at 1239–40); and (2) an interrogating officer's knowing false statement to Holland that Chicago police had seen his car "in the alley involved in the rape incident," and that while Holland could not be identified, "he would have to explain why the vehicle was there" rendered Holland's confession involuntary and thus inadmissible (*id.* at 340, 100 Ill.Dec. at 880, 497 N.E.2d at 1242).

Holland, a white man, also argued that the state's improper use of its peremptory challenges at trial had violated his "constitutional right to a jury drawn from a fair cross-section of the community." *Id.* at 326–27, 100 Ill.Dec. at 871, 497 N.E.2d at 1233. The prosecution used two of its ten peremptories to excuse the only two black venirepersons of a venire of forty. *Id.* at 326, 100 Ill.Dec. at 871, 497 N.E.2d at 1233. The appellate judge noted that the Supreme Court had recently decided a case, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), involving the constitutional propriety of peremptory challenges used to systematically exclude jurors on the basis of race. *Id.*, 147 Ill. App.3d at 327, 100 Ill.Dec. at 871, 497 N.E.2d at 1233. In *Batson*, the Court held that such a practice violates the Fourteenth

Amendment's equal protection guarantees. *Batson*, 476 U.S. at 90, 106 S.Ct. at 1719.[1]

The appellate court found it unnecessary to adjudicate Holland's *Batson* argument because: (1) it overturned Holland's conviction and remanded the case for a new trial on other grounds; (2) *Batson* was handed down by the Supreme Court during the pendency of Holland's appeal, meaning that "the parties and trial judge in the instant case did not have the benefit of the ... decision when the alleged peremptory challenge improprieties occurred"; and (3) "with *Batson* now controlling, it is highly unlikely that this issue will recur on retrial." *People v. Holland*, 147 Ill.App.3d at 327, 100 Ill.Dec. at 871, 497 N.E.2d at 1233.

The state, however, appealed the decision to the Illinois Supreme Court, which reversed and affirmed Holland's conviction. *People v. Holland*, 121 Ill.2d 136, 163–64, 117 Ill.Dec. 109, 121, 520 N.E.2d 270, 282 (1987). The state supreme court determined that Holland's waiver of the right to counsel was valid "despite the fact that he was not told that an attorney wanted to confer with him prior to any interrogation or lineup." *Id.* at 153, 117 Ill.Dec. at 116–17, 520 N.E.2d at 277–78. Additionally, the court found that the interrogating officer's false statement to Holland would not invalidate Holland's confession because "there is no indication that the defendant lacked the capacity to understand his rights," the officer questioned Holland only briefly, and the statement did not threaten Holland "or imply that either the defendant or a loved one would be harmed in some way if the defendant asserted his right to remain silent rather than explain the presence of his automobile in the alley." *Id.* at 155, 117 Ill.Dec. at 117, 520 N.E.2d at 278.

The state supreme court did not consider the equal protection ramifications of Holland's peremptory challenge argument. It found that "the defendant, a Caucasian, does not have standing to assert a *Batson*

violation." *Id.*, 121 Ill.2d at 157, 117 Ill. Dec. at 118, 520 N.E.2d at 279. Under *Batson*, the court said,

> the defendant challenging the exclusion of prospective jurors because of their race must show "that members of *his* race have been impermissibly excluded." (Emphasis added.) (476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69, 85–86.) Since defendant is white and the excluded prospective jurors are black, he is unable to show that members of his race have been excluded impermissibly. Thus, he is unable to establish the threshold element of a *prima facie Batson* violation.

*Id.* But see id., 121 Ill.2d at 173, 117 Ill. Dec. at 125–26, 520 N.E.2d at 286–87 (Simon, J., dissenting) ("because all prospective black jurors were kept from service on the jury through the State's use of peremptory challenges, defendant is entitled at the very least to a hearing on whether those jurors were unconstitutionally excluded from the jury which convicted him in violation of *Batson*"). The court also rejected Holland's argument that the state violated his right to a jury representing a fair cross-section of the community when it excused the two black venirepersons. *Id.* at 158, 117 Ill.Dec. at 118–19, 520 N.E.2d at 279–80 (majority opinion).

The United States Supreme Court granted certiorari to consider Holland's Sixth Amendment "fair cross-section" claim. *Holland v. Illinois*, 489 U.S. 1051, 109 S.Ct. 1309, 103 L.Ed.2d 579 (1989). Indeed, in his brief before the Supreme Court, Holland presented only the "narrow question" of whether state conduct violative of the equal protection clause (as in *Batson*) *also* violates Sixth Amendment protections. Brief for Petitioner at 6, *Holland v. Illinois*, —— U.S. ——, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (emphasis added). Holland conceded that *Batson* "applies only in cases where the defendant himself is a member of the cognizable group excluded

---

1. The efficacy of considering a "Sixth Amendment" claim separate from an "equal protection" claim in this context is uncertain at best. Indeed, at least one Supreme Court justice has explicitly suggested "that the two claims over-

lap." *Holland v. Illinois*, —— U.S. ——, 110 S.Ct. 803, 821 n. 4, 107 L.Ed.2d 905 (1990) (Stevens, J., dissenting). The two claims are, at a minimum, closely related.

from the petit jury," but argued that a "similar rule predicated on the Sixth Amendment would apply in all cases, irrespective of the race of the defendant and would, therefore, apply to petitioner, who is white." *Id.*[2]

The Supreme Court ruled that Holland had standing to bring a Sixth Amendment claim, since, unlike an equal protection claim, such an argument has never been predicated on a "correlation between the group identification of the defendant and the group identification of excluded venire members...." *Holland v. Illinois,* — U.S. ——, 110 S.Ct. 803, 805, 107 L.Ed.2d 905 (1990). That is, every defendant is entitled to a venire representing a fair cross-section of the community, "whether or not the systematically excluded groups are groups to which he himself belongs." *Id.*

The Court declined, however, to extend the "fair cross-section" requirement from the venire to the petit jury. It rejected Holland's contention "that a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the 'fair possibility' of a representative jury." *Id.,* 110 S.Ct. at 806. While noting that the venire fair cross-section notion had solid roots in the Sixth Amendment, "traditional understanding" of the amendment itself and how an impartial jury is impaneled does not include—nor has it ever included—"the notion that, in the process of drawing the jury, that initial representativeness cannot be diminished by allowing both the accused and the State to eliminate persons thought to be inclined against their interests—which is precisely how the traditional peremptory-challenge system operates." *Id.* at 807.

Responding to Justice Marshall's dissent, Justice Scalia wrote for the majority[3] that Holland's claim was not about race—that

---

**2.** The petitioner in *Batson* similarly framed his argument in Sixth Amendment "fair cross-section" terms, apparently shelving any equal protection claim "to avoid inviting the Court directly to reconsider one of its own precedents," *Swain v. Alabama. Batson,* 476 U.S. at 84 n. 4, 106 S.Ct. at 1716 n. 4. The Supreme Court, however, decided *Batson* on equal protection grounds, notwithstanding petitioner's proffered Sixth Amendment contentions. *Id.* ("We agree with the State that resolution of petitioner's claim properly turns on application of equal protection principles and express no view on the merits of any of petitioner's Sixth Amendment arguments.").

This maneuver by the majority prompted a vigorous dissent from Chief Justice Burger, who noted that the court's holding was "truly extraordinary" because "it is based on a constitutional argument that the petitioner has *expressly declined to raise,* both in this Court and in the Supreme Court of Kentucky." *Id.* at 113, 106 S.Ct. at 1731 (emphasis in original) (Burger, C.J., dissenting). Chief Justice Burger even suggested reargument on the case in lieu of the "strange jurisprudence" that employs the "alternative grounds urged by respondent to affirm a judgment ... to permit petitioner to obtain relief from that very judgment despite petitioner's failure to urge that ground." *Id.* at 117, 106 S.Ct. at 1734.

In deciding Holland's petition nearly four years later, the Court stuck to the Sixth Amendment issues before it, though not without a backward glance at the jurisprudential anomaly in *Batson. Holland v. Illinois,* 110 S.Ct. at 811 n.

**3** ("Our grant of certiorari was limited to the Sixth Amendment question, and the equal protection question has been neither briefed nor argued."). Justice Stevens argued that the equal protection issue should nonetheless be reached, given the "overlap" between the two claims and that state's position that Holland's Sixth Amendment assertions were really "equal protection arguments in disguise...." *Id.* at 821 n. 4 (Stevens, J., dissenting). The majority, however, declined to again bypass its usual procedures:

It is almost unprecedented to accept certiorari on a question involving one constitutional provision and then to decide the case under a different constitutional provision neither presented, briefed, nor argued. The exception was *Batson,* where, as accurately described in Chief Justice Burger's dissent, "the Court depart[ed] dramatically from its normal procedure without any explanation." [Citation omitted.] Justice STEVENS asserts that *Batson* "makes it appropriate" to reach the equal protection claim here.... We decline to convert *Batson* from an unexplained departure to an unexplained rule.

*Id.; cf.* Sup.Ct.R. 14.1(a) ("Only the questions set forth in the petition, *or fairly included therein,* will be considered by the Court.") (emphasis added).

**3.** Chief Justice Rehnquist and Justices White, O'Connor, and Kennedy joined Justice Scalia. Justice Kennedy filed a separate concurring opinion. Justice Marshall dissented, joined by Justices Brennan and Blackmun. Justice Stevens separately dissented.

his Sixth Amendment argument would be "just as strong" had he objected to the exclusion of virtually any other group, like "postmen, or lawyers, or clergymen." *Id.* at 810. The Court does not hold, added Justice Scalia, "that the systematic exclusion of blacks from the jury system through peremptory challenges is lawful; it obviously is not...." *Id.* at 810–11. "Nor," he continued, "do we even hold that *this particular (white) defendant does not have a valid constitutional challenge to such racial exclusion.*" *Id.* at 811 (footnote omitted) (emphasis added).

Justice Kennedy filed a short concurrence. He stated the "established rule" from *Batson*—"exclusion of a juror on the basis of race, whether or not by use of a peremptory challenge, is a violation of the juror's constitutional rights"—and emphasized that if Holland's claim had been "based on the Fourteenth Amendment Equal Protection Clause, it would have merit." *Id.* (Kennedy, J., concurring). Justice Marshall's dissent, joined by Justices Brennan and Blackmun, made the same point in somewhat more expansive fashion:

> Nowhere [in *Batson*] did the Court state ... that a white defendant could not make out a prima facie case based upon the exclusion of Afro–American jurors, and the logic of the Court's decision would not have supported such a conclusion.
>
> ... More fundamentally, [petitioner] Batson was permitted to raise not only his rights, but also those of the members of the venire and of the general public. If Batson could do so, there is no reason a white defendant cannot do so as well.

In any event, the question whether a defendant's race affects his standing to invoke *Batson* is one on which the Court has not ruled. For the reader who seeks guidance on how the Court would rule if the issue were presented and argued, the agreement of five Justices that a defendant's race is irrelevant to the Fourteenth Amendment standing inquiry is far more illuminating than the majority's veiled intimations and cryptic turns of phrase.

*Id.* at 813–14 (Marshall, J., dissenting).

Justice Stevens also dissented. "Our decision in *Batson*," he wrote, "makes it appropriate to begin our analysis by recognizing that petitioner's equal protection argument is plainly meritorious and entitles him to relief." *Id.* at 821 (Stevens, J., dissenting).

## II. Holland's Equal Protection Argument

The question before us is whether a white defendant bringing a *Batson* equal protection argument is entitled to habeas relief, where the United States Supreme Court has strongly hinted in dicta that such an argument, directly presented, would be a "valid constitutional challenge" (*id.* at 811 & n. 3 (majority opinion)), "supported" by the logic of *Batson* (*id.* at 813 (Marshall, J., dissenting)), and "plainly meritorious" (*id.* at 821 (Steven, J., dissenting)); *see also id.* at 811 (Kennedy, J., concurring) (equal protection claim brought by "defendant of a race different than that of the juror ... would have merit"). We answer that question in the affirmative. Because we order more expansive relief on the physical coercion issue, an evidentiary hearing is unnecessary. We emphasize, however, that absent the physical coercion finding, Holland would be granted an evidentiary hearing to develop *Batson* claim evidence.

■ Our holding on the equal protection grounds, however, is important as an alternative basis for relief, and it is thus necessary that we address its underpinnings in some detail. Preliminarily, we find that Holland has exhausted each of his state court claims. Answer to Habeas Petition, at 7; *see also* Rule 5, Rules Governing Section 2254 Cases in the United States District Courts (28 U.S.C. § 2254, Rules following) (answer "shall state whether the petitioner has exhausted his state remedies"). Moreover, a petitioner is clearly not required to appeal to the United States Supreme Court as a predicate to filing for habeas relief. *County Court of Ulster County v. Allen,* 442 U.S. 140, 149 n. 7, 99 S.Ct. 2213, 2220 n. 7, 60 L.Ed.2d 777 (1979);

*Holloway v. McElroy,* 632 F.2d 605, 615 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981); *Barber v. Scully,* 557 F.Supp. 1292, 1293–94 (S.D.N.Y.1983) ("a habeas petitioner is not required to present any claims to the United States Supreme Court prior to filing a petition for habeas corpus."), *aff'd,* 731 F.2d 1073 (2d Cir.1984). Holland's failure to raise his *Batson* claim before the Supreme Court is irrelevant, just as it would be irrelevant had he never filed a certiorari petition on any of his arguments.

Respondent Kenneth McGinnis' opposition to Holland's equal protection claim rests heavily on the following passage from *Batson:*

> [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, *the defendant first must show that he is a member of a cognizable racial group* ..., and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race.*

*Batson,* 476 U.S. at 96, 106 S.Ct. at 1723 (emphases added). Justice Scalia's majority opinion in *Holland v. Illinois* cited the same language, apparently approvingly. *Holland v. Illinois,* 110 S.Ct. at 805.

This language, McGinnis argues, establishes a threshold requirement that Holland, a white male, simply cannot meet. An argument that " 'Batson is not limited to those who share the same race as the stricken jurors' ... is startling. Holland clearly misstates the law. This Court must reject Holland's claim on the merits for the reasons stated in *Batson* and reaffirmed in *Holland.*" McGinnis' Motion for Summary Judgment, at 7; *see also People v. Holland,* 121 Ill.2d at 157, 117 Ill.Dec. at 116, 520 N.E.2d at 279 (Holland unable to establish "threshold element" of *Batson* claim).

■ Despite the reappearance of certain language in *Holland v. Illinois,* we do not believe that the mere fact that Holland is white precludes an equal protection claim addressing the propriety of racially-motivated peremptory challenges at trial. The denial of such a claim would be contrary to the themes interwoven in the *Batson* tapestry—themes emphasized, in varying degrees, by all nine Justices in *Holland v. Illinois.*

Consider Justice Scalia's majority opinion, which we excerpt in relevant part here:

> It is not remotely true that our opinion today "lightly ... set[s] aside" the constitutional goal of "eliminat[ing] racial discrimination in our system of criminal justice." [Marshall, J., dissenting, 110 S.Ct.] at 819. The defendant in this case is not a black man, but a convicted white rapist who seeks to use the striking of blacks from his jury to overturn his conviction. His Sixth Amendment claim would be just as strong if the object of the exclusion had been, not blacks, but postmen, or lawyers, or clergymen, or any number of other identifiable groups. Race as such has nothing to do with the legal issue in this case. We do not hold that the systematic exclusion of blacks from the jury system through peremptory challenges is lawful; it obviously is not, see *Batson, supra.* We do not even hold that the exclusion of blacks through peremptory challenges in this particular trial was lawful. Nor do we even hold that this particular (white) defendant does not have a valid constitutional challenge to such racial exclusion. [Footnote 3 omitted.] All we hold is that he does not have a valid constitutional challenge *based on the Sixth Amendment*—which no more forbids the prosecutor to strike jurors on the basis of race than it forbids him to strike them on the basis of innumerable other generalized characteristics.

> To be sure, as Justice MARSHALL says, the Sixth Amendment sometimes operates "as a weapon to combat racial discrimination," *post,* at 820, n. 2—just as statutes against murder sometimes operate that way. But it is no more reasonable to portray this as a civil rights case than it is to characterize a proposal for increased murder penalties

as an antidiscrimination law. Since *only* the Sixth Amendment claim, and not the equal protection claim is at issue, the question before us is not whether the defendant has been unlawfully discriminated against because he was white, or whether the excluded jurors have been unlawfully discriminated against because they were black, but whether the defendant has been denied the right to "trial by an impartial jury." The earnestness of this Court's commitment to racial justice is not to be measured by its willingness to expand constitutional provisions designed for other purposes beyond their proper bounds.

*Holland v. Illinois,* 110 S.Ct. at 810–11 (emphasis in original).

Footnote 3, omitted above (though discussed in some detail in our footnote 2, *supra*), reads in relevant part as follows:

> As noted at the outset, petitioner did not seek review of the denial of his Equal Protection Clause claim. Our grant of certiorari was limited to the Sixth Amendment question, and the equal protection question has been neither briefed nor argued.
>
> Justice STEVENS' contention that the equal protection question should nonetheless be decided ... contradicts Rule 14.1(a) of this Court.... It is almost unprecedented to accept certiorari on a question involving one constitutional provision and then to decide the case under a different constitutional provision neither presented, briefed, nor argued.

*Id.* at 811 n. 3.

We read the broad hints dropped in dicta as pointing in only one direction: if Holland had argued the equal protection teaching of *Batson,* the Court would have been compelled to grant relief. Justice Scalia repeatedly emphasizes that Holland "neither briefed nor argued" the equal protection issue. *Id.* at 805; *id.* at 811; *id.* at 811 n. 3.

Justice Kennedy's concurring opinion strengthens our finding that Holland's equal protection claim is meritorious. He stresses that the focus is on the black juror's rights as vindicated by the defendant, whose own racial characteristics are of only peripheral significance:

> Many of the concerns expressed in *Batson,* a case where a black defendant objected to the exclusion of black jurors, support as well an equal protection claim by a defendant whose race or ethnicity is different from the dismissed juror's. To bar the claim whenever the defendant's race is not the same as the juror's would be to concede that racial exclusion of citizens from the duty, and honor, of jury service will be tolerated, or even condoned. We cannot permit even the inference that this principle will be accepted, for it is inconsistent with the equal participation in civic life that the Fourteenth Amendment guarantees. I see no obvious reason to conclude that a defendant's race should deprive him of standing in his own trial to vindicate his own jurors' right to sit. As Justice MARSHALL states, *Batson* is based in large part on the right to be tried by a jury whose members are selected by nondiscriminatory criteria and on the need to preserve public confidence in the jury system. These are not values shared only by those of a particular color; they are important to all criminal defendants.
>
> Support can be drawn also from our established rules of standing, given the premise that a juror's right to equal protection is violated when he is excluded because of his race. See *Batson, supra,* at 87, 106 S.Ct., at 1718. Individual jurors subjected to peremptory racial exclusion have the legal right to bring suit on their own behalf, *Carter v. Jury Comm'n of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), but as a practical matter this sort of challenge is most unlikely. The reality is that a juror dismissed because of his race will leave the courtroom with a lasting sense of exclusion from the experience of jury participation, but possessing little incentive or resources to set in motion the arduous process needed to vindicate his own rights. We have noted that a substantial relation may entitle one party to raise the rights of another. See *Singleton v. Wulff,* 428 U.S. 106, 114–115,

96 S.Ct. 2868, 2874–2875, 49 L.Ed.2d 826 (1976). An important bond of this type links the accused and an excluded juror. In sum, the availability of a Fourteenth Amendment claim by a defendant not of the same race as the excluded juror is foreclosed neither by today's decision, nor by *Batson.*

*Id.* at 811–12 (Kennedy, J., concurring).

Justice Kennedy directly addressed McGinnis' argument that racial homogeneity is a prerequisite to a *Batson* claim:

*Batson* did contain language indicating that the peremptory challenge of jurors of the same race as the defendant presents a different situation from the peremptory challenge of jurors of another race, but I consider the significance of the discussion to be procedural. An explicit part of the evidentiary scheme adopted in *Batson* was the defendant's showing that he was a member of a "cognizable racial group," and that the excluded juror was a member of the same group. See 476 U.S., at 96–98, 106 S.Ct., at 1723–24. The structure of this scheme rests upon grounds for suspicion where the prosecutor uses his strikes to exclude jurors whose only connection with the defendant is the irrelevant factor of race. It is reasonable in this context to suspect the presence of an illicit motivation, the "belief that blacks could not fairly try a black defendant." *Id.,* at 101, 106 S.Ct., at 1725–26 (WHITE, J., concurring). Where this obvious ground for suspicion is absent, different methods of proof may be appropriate.

*Id.,* 110 S.Ct. at 812 (Kennedy, J., concurring).

Justice Marshall's dissent notes with some frustration Holland's disavowal of the equal protection argument, but points out that "[a]s a majority of this Court has now concluded, a close reading of *Batson* shows that a defendant's race is irrelevant to his standing to raise the equal protection claim recognized in that case." *Id.,* 110 S.Ct. at 812–13 (Marshall, J., dissenting) (citing to his own dissent, joined by Justices Brennan and Blackmun, Justice Kennedy's

concurring opinion, and Justice Stevens' separate dissent). Justice Marshall further points out that

[a]lthough the majority implies that a defendant has a greater Fourteenth Amendment interest in being tried by a jury from which members of his race (as opposed to people of other races) have not been excluded, *ante,* at 805, I do not read the majority to suggest that a defendant of a race different from that of the people excluded has *no* interest in the racial composition of the jury. More fundamentally, Batson was permitted to raise not only his rights, but also those of the members of the venire and of the general public. If Batson could do so, there is no reason a white defendant cannot do so as well.

In any event, the question whether a defendant's race affects his standing to invoke *Batson* is one on which the Court has not ruled. For the reader who seeks guidance on how the Court would rule if the issue were presented and argued, the agreement of five Justices that a defendant's race is irrelevant to the Fourteenth Amendment standing inquiry is far more illuminating than the majority's veiled intimations and cryptic turns of phrase.

*Id.* at 813–14 (Marshall, J., dissenting) (emphasis in original).

Justice Stevens' dissent reiterates some of the points made by Justices Kennedy and Marshall:

[T]he concerns that were expressed in *Batson* are not properly confined to the context in which a defendant objects to the exclusion of jurors of his own race but support also "an equal protection claim by a defendant whose race or ethnicity is different from the dismissed juror's." [Citing to Justices Kennedy and Marshall's separate opinions in *Holland v. Illinois.*] Our decision in *Batson* was based on the conclusion that "[r]acial discrimination in the selection of jurors harms not only the accused whose life or liberty they are summoned to try," but also "the excluded juror." 476 U.S., at 87, 106 S.Ct., at 1718. "Selection proce-

dures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Ibid.* Batson was a black citizen, but he had no interest in serving as a juror and thus was not a member of the excluded class. His standing to vindicate the interests of potential black jurors was based on his status as a defendant. [Footnote omitted.] Indeed, the suggestion that only defendants of the same race or ethnicity as the excluded jurors can enforce the jurors' right to equal treatment and equal respect recognized in *Batson* is itself inconsistent with the central message of the Equal Protection Clause.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case." *Batson,* 476 U.S., at 89, 106 S.Ct., at 1719. As Justice KENNEDY states, while the inference that the discriminatory motive is at work is stronger when the excluded jurors are of the same race or ethnicity as the defendant, the discriminatory use of peremptory challenges is not limited to that situation but may be present when, as here, the excluded jurors are not of the same race as the defendant. *Ante,* at 812 (concurring opinion). Petitioner, however, was not permitted to present any evidence to support his claim because the state court ruled that he did not have standing to assert the rights of the excluded jurors. For the reasons stated by Justice KENNEDY, that ruling was plainly wrong.

*Id.* at 821–22.

Our decision today might be untenable if constructed unilaterally, but these passages from *Holland v. Illinois* lend significant guidance, and our finding is dictated by the clear message broadcast by all nine Justices. That message is that a white defendant may bring a *Batson* equal protection claim against the prosecution's use of peremptory challenges to exclude jurors on the basis of race at trial.

■ Of course, Holland's claim must survive a final hurdle—the hurdle of retroactivity analysis. We have recently had occasion to wade through this thicket in the context of another habeas petition. *See Williams v. Chrans,* 742 F.Supp. 472, 481–84 (N.D.Ill.1990).[4] It will not be necessary to repeat all or nearly all of what we said there to resolve Holland's claim.

■ Following its decision in *Batson,* the Supreme Court explicitly held that its decision there must be "applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). The Court decided *Batson* while Holland's appeal in the Illinois state court system was pending. *People v. Holland,* 147 Ill.App.3d at 327, 100 Ill.Dec. at 871, 497 N.E.2d at 1233. It follows that the rule in *Batson*—a juror's constitutional rights are violated when he or she is excluded from a jury on the basis of race, whether or not by use of a peremptory challenge—must be retroactively applied to Holland's case. The passages from *Holland v. Illinois* excerpted above support this finding.

It could be argued that we are extending the rule of *Batson* in a completely new direction; this is perhaps what McGinnis means when he contends that "Holland clearly misstates the law." Our finding

---

**4.** Neither McGinnis nor Holland address this issue in their respective memoranda of law. Retroactivity analysis means only the following: "a 'new rule' of federal constitutional law cannot apply in cases on collateral review, including capital cases, unless the rule comes within one of two narrow exceptions." *Williams,* 742 F.Supp. at 482. The first exception is for a new rule placing " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' "

*Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989) (quoting *Mackey v. United States,* 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (Harlan, J., separate opinion)). A second exception "is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Williams,* 742 F.Supp. at 484 (quoting *Saffle v. Parks,* —— U.S. ——, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990)).

that a white defendant may assert a *Batson* claim does not, however, constitute a "new rule" as that phrase is used in retroactivity analysis. *See Williams*, 742 F.Supp. at 482 (citing *Saffle*, 110 S.Ct. 1257; *Teague*, 489 U.S. 288, 109 S.Ct. 1060; *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). We do nothing more here than require application of *Batson* to the particular circumstances in Holland's case. This requirement is not a "new rule" because it is *"dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original). Permitting a white defendant to protect a black juror's equal protection rights is merely an application of the principle that governed the Supreme Court's decision in *Batson*, and is thus not a "new rule" subject to the stringent dictates of retroactivity analysis. *See id.* at 306–08, 109 S.Ct. at 1073.

In short, there is no retroactivity problem. We reiterate that, absent our finding of physical coercion, an evidentiary hearing would be ordered to enable Holland to present "essential facts concerning a *Batson* violation not currently contained in the State record." Petitioner's Memorandum of Law, at 5.

### III. Physical Coercion Claim

At a pretrial hearing on Holland's motion to suppress his confession, the state trial judge considered testimony relating to Holland's claim that he had been physically abused by various police officers. In ruling on the motion, the judge observed that " 'there is no question that some degree of confrontation took place in Schiller Park ..., and there is no question that [Holland] apparently sustained some injury.' " *People v. Holland*, 147 Ill.App.3d at 331, 100 Ill.Dec. at 874, 497 N.E.2d at 1236 (quoting trial court).

The trial judge further ruled that " 'there was a physical, apparently very severe physical confrontation ... that night,' " and that Holland's lawyer " 'observed physical injuries to the right knee of the defendant.' " *Id.* (quoting trial court). Holland's own testimony was that Schiller

Park police had, on two separate occasions, "kicked, hit, and knocked [him] to the ground, punched and beaten [him] with a nightstick," among other things. *People v. Holland*, 121 Ill.2d at 173, 117 Ill.Dec. at 126, 520 N.E.2d at 287 (Simon, J., dissenting). Indeed, following a medical examination the next day, doctors told Holland that he had probably sustained rib fractures in the midchest area. *Id.* at 174, 117 Ill.Dec. at 126, 520 N.E.2d at 287 (Simon, J., dissenting).

The trial judge suppressed any statement made by Holland at the Schiller Park police station (the first station Holland was taken to), finding that " 'that degree of [severe] physical confrontation contaminate[d]' " any such statement. *People v. Holland*, 147 Ill.App.3d at 331, 100 Ill.Dec. at 874, 497 N.E.2d at 1236 (quoting trial court). He declined, however, to suppress statements subsequently made by Holland at the Des Plaines police station. *Id.* at 332, 100 Ill.Dec. at 874, 497 N.E.2d at 1236.

On appeal, Holland argued that because statements he made at the Schiller Park station had been ruled inadmissible at trial, a further finding should have been made that statements he made at the Des Plaines station shortly thereafter were also the product of police brutality and therefore inadmissible. *Id.* The appellate court sidestepped the issue:

> We decline to rule on whether the Schiller Park police brutality carried over to invalidate defendant's Des Plaines police station confession inasmuch as we agree with the defendant's further contention that he did not waive his right to counsel during the custodial interrogation at the Des Plaines station because the police did not tell him that his attorney was trying to reach him.

*Id.*

The Illinois Supreme Court employed a sort of two-pronged analysis. On the one hand, the court said, "[o]ur review of the record indicates that there was no affirmative showing that the defendant was beaten by Schiller Park police." *People v. Holland*, 121 Ill.2d at 156, 117 Ill.Dec. at 118, 520 N.E.2d at 279. The trial court found

only "that there had been some sort of 'physical confrontation,'" and, "in the absence of an affirmative showing of physical coercion by the Schiller Park police, there can be no coercion available to infect" the Des Plaines interrogations. *Id.* at 157, 117 Ill.Dec. at 118, 520 N.E.2d at 279.

On the other hand, the court made a distinction between Holland's situation and those presented in two previous cases, *People v. Santucci*, 374 Ill. 395, 29 N.E.2d 508 (1940), and *People v. Thomlison*, 400 Ill. 555, 81 N.E.2d 434 (1948). In those cases, a defendant confessed to police after having been beaten by members of the same police force. *See Santucci*, 374 Ill. at 398–401, 29 N.E.2d at 509–11; *Thomlison*, 400 Ill. at 562–64, 81 N.E.2d at 438–40. Rejecting Holland's argument that "physical coercion by one governmental entity renders involuntary any statements made to another governmental entity even though no physical force is used by the second entity," the court ruled that "[t]he 'physical confrontation' between the defendant and the Schiller Park police had no bearing on the events which transpired between the defendant and the Des Plaines police...." *People v. Holland*, 121 Ill.2d at 157, 117 Ill.Dec. at 118, 520 N.E.2d at 279.

McGinnis makes three arguments against granting habeas relief on the physical coercion question: (1) As the Illinois Supreme Court found, Holland failed to prove that he was physically abused; (2) alternatively, even if Holland did prove the beating, that physical abuse did not taint the Des Plaines statements; and (3) any error in not suppressing the Des Plaines confession was harmless error. Respondent's Summary Judgment Memorandum, at 7–22. We address these points separately.

First, there can be no doubt that Holland was beaten at the Schiller Park police station. The trial judge determined that "'a physical, apparently very severe physical confrontation'" took place, *People v. Holland*, 147 Ill.App.3d at 331, 100 Ill. Dec. at 874, 497 N.E.2d at 1236 (quoting trial court), and, particularly in this instance,[5] it is the state trial court's factual findings that are entitled to a presumption of correctness. *See White v. Finkbeiner*, 570 F.2d 194, 201 (7th Cir.1978) (rejecting Illinois Supreme Court's unsupported factual finding, noting that 28 U.S.C. § 2254(d)'s presumption of correctness generally applies "to determinations of historical fact 'made by the judge who heard the evidence, for only he is in a position to evaluate the credibility of the witnesses'") (citation omitted); *see also United States ex rel. Bornholdt v. Ternullo*, 402 F.Supp. 374, 377 (S.D.N.Y.1975) ("[f]actual findings by state trial courts ... should be considered presumptively correct"). The "unsupported" factual findings of a tribunal unable "to test the credibility of witnesses by observing their demeanor in the course of direct and cross-examination are usually not dispositive in a federal habeas proceeding." *Finkbeiner*, 570 F.2d at 201; *see also Dickerson v. Alabama*, 667 F.2d 1364, 1368 (11th Cir.) ("factual determinations of a state appellate court are to be accorded a presumption of correctness only to the ex-

---

5. Generally, the factual determinations of all state courts, whether trial or appellate, are accorded a "presumption of correctness" by the federal court processing a habeas petition. *Sumner v. Mata*, 449 U.S. 539, 547–48, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). However, when an appellate court like the Illinois Supreme Court "invent[s] a fact" in direct contravention to the state trial court's findings, its "phantom" finding eliminates the presumption. *See Carter v. Gray*, 575 F.Supp. 190, 194–95 (N.D.Ohio 1983). In *Carter*,

> [t]he Supreme Court of Ohio reversed [the trial court's finding that defendant's plea was involuntary] even though it had not heard the testimony presented at the evidentiary hearing and had not had an opportunity to ob-

serve the demeanor of the witnesses and weigh the credibility of their testimony. The Ohio Supreme Court's decision to reverse was not based on a finding that the Ohio court of appeals had misapplied the law; rather, it was based on the Ohio Supreme Court's own new version of the facts.

*Id.* at 194. The Illinois Supreme Court's "finding" that Holland had not made an "affirmative showing" that he was beaten by Schiller Park police similarly contradicts the factual findings of the state trial judge—its "new factual finding was not an inference which could be drawn from the record as a whole; rather, it was an outright contradiction of the trial court's finding...." *Id.*

tent that they are 'fairly supported by the record'") (quoting 28 U.S.C. § 2254(d)(8)), *cert. denied,* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982); *cf. Carter v. Gray,* 575 F.Supp. 190, 194–95 (N.D.Ohio 1983).

The state supreme court's alternative rationale for denying Holland's physical coercion claim is a corollary to McGinnis' second argument opposing habeas relief. McGinnis asserts that even if Holland was physically abused, a breach in the stream of events between the abuse and the subsequent confession eliminates any taint that might otherwise attach to such a statement. The supreme court's apparent alternative rationale below was that a statement given to a second governmental entity would not necessarily be tainted by earlier physical abuse at the hands of a separate governmental entity.

■■■■ Involuntary confessions—the larger group of which confessions resulting from physical coercion constitute a subset—are properly measured by consideration of "'the totality of the circumstances.'" *Holleman v. Duckworth,* 700 F.2d 391, 396 (7th Cir.) (quoting *Fikes v. Alabama,* 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957)), *cert. denied,* 464 U.S. 834, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983); *see also Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20

L.Ed.2d 77 (1968) (same).[6] The fact that the accused "has already made an involuntary confession is a strong indication that later statements were not the product of his free will," though the prior involuntary statement "is not dispositive on the issue" of the voluntariness of the later statement. *Holleman,* 700 F.2d at 396 (citing *United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 1398–99, 91 L.Ed. 1654 (1947)). Further, while a second statement is not automatically suspect simply because a first statement is inadmissible, "subsequent confessions *must* be excluded where the coercion surrounding the first statement had not dissipated at the time of the subsequent statements." *Smith v. Wainwright,* 777 F.2d 609, 618 (11th Cir.1985) (emphasis added) (citing *United States v. Bayer, supra*), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986); *see also Holleman,* 700 F.2d at 396 ("When the timing and conditions of the confessions are 'so close that one must say the facts of one control the character of the other' the subsequent confession will be suppressed.") (quoting *Leyra v. Denno,* 347 U.S. 556, 561, 74 S.Ct. 716, 719, 98 L.Ed. 948 (1957)).

■ An analysis of the totality of the relevant circumstances demonstrates that Holland's second confession "was tainted

---

**6.** While we do not find that Holland's mental coercion claim is itself a sufficient independent ground on which to grant relief, we do find that, considered in the totality of the circumstances, the behavior Holland complains of contributed to an impermissibly coercive environment. Subsequent to his beating at the Schiller Park police station, a Des Plaines officer told Holland that a report had come in from the Chicago police department that Holland's vehicle had been spotted in the alley where the rape occurred, and that while Holland could not be positively identified, he would certainly have to explain why his car was there. *People v. Holland,* 121 Ill.2d at 153, 117 Ill.Dec. at 117, 520 N.E.2d at 278. No such report actually existed. *Id.* The state appellate court held that Holland's ensuing confession was involuntary because it was "improperly obtained by subterfuge." *People v. Holland,* 147 Ill.App.3d at 340, 100 Ill.Dec. at 880, 497 N.E.2d at 1242. The state supreme court disagreed, ruling, in part, that the police officer's subterfuge "did not threaten or imply that either the defendant or a loved one would be harmed in some way if the defendant assert-

ed his right to remain silent rather than explain the presence of his automobile in the alley." *People v. Holland,* 121 Ill.2d at 155, 117 Ill.Dec. at 117, 520 N.E.2d at 278 (distinguishing *Lynumn v. Illinois,* 372 U.S. 528, 530–35, 83 S.Ct. 917, 918–21, 9 L.Ed.2d 922 (1963); *Spano v. New York,* 360 U.S. 315, 319, 322–23, 79 S.Ct. 1202, 1205, 1206–07, 3 L.Ed.2d 1265 (1959)).

We believe that Justice Simon's dissenting opinion more properly characterizes the effect of the Des Plaines officer's misstatement, although we reiterate that such effect is not itself enough to justify relief. "The effect of the officer's subterfuge," Justice Simon wrote, "which falsely implied that the police had eyewitness evidence against defendant, must be judged in light of the facts that defendant was suffering physical injuries and had already been interrogated and given an exculpatory statement." *Id.* 121 Ill.2d at 178, 117 Ill.Dec. at 128, 520 N.E.2d at 289 (Simon, J., dissenting). It is fundamentally the physical coercion that justifies habeas relief; the mental coercion here is simply a not insignificant factor that we evaluate in the totality of the circumstances.

by the physical confrontation in Schiller Park, and the trial court erred in concluding that the confession was admissible." *People v. Holland*, 121 Ill.2d at 175, 117 Ill.Dec. at 126, 520 N.E.2d at 287 (Simon, J., dissenting). Holland

> confessed within approximately six hours of sustaining significant injuries while in the custody of the Schiller Park police. When asked [at the suppression hearing,] "Did you confess because ... you were hurt?" the defendant replied, "Yes, I wanted people to just leave me alone." That defendant suffered no additional physical brutality at the Des Plaines station (a fact which defendant disputes) does not vitiate the physical coercion to which defendant had already been subjected, especially because at the time of his confession defendant had received no medical treatment for his injuries. In view of these circumstances, the numerous *Miranda* warnings defendant received before confessing, and his experience in dealing with the police, could not cure the coercive effect of the actions of the Schiller Park police.

*Id.*

The authority cited by McGinnis is not inapposite. In one case, an initial confession was improperly obtained but not used at trial. *Lyons v. Oklahoma*, 322 U.S. 596, 602, 64 S.Ct. 1208, 1212, 88 L.Ed. 1481 (1944). At some later point,

> in another place and with different persons present, the accused again told the facts of the crime. Involuntary confessions, of course, may be given either simultaneously with or subsequently to unlawful pressures, force or threats. The question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances.

*Id.* The Court added that "[t]he effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." *Id.* at 603, 64 S.Ct. at 1212–13. In *Lyons,*

twelve hours separated the earlier coerced statement from the subsequent confession, the defendant confessed to a prison warden with whom he was acquainted, and days later reiterated his confession; these factors served to "rehabilitate" the confession. *Id.* at 604, 64 S.Ct. at 1213. That is not our case here; Holland confessed a mere six hours following abuse at the Schiller Park police station, his subsequent statements were made to unfamiliar police officers at the Des Plaines station, and he did not thereafter repeat his confession.

*Leon v. Wainwright*, 734 F.2d 770 (11th Cir.1984) involved an atypical circumstance of police coercion. Officers initially used force and threats to ascertain the location of the still missing kidnap victim. *Id.* at 773. This "violence was not inflicted to obtain a confession or provide other evidence to establish [Leon]'s guilt." *Id.* at 773 n. 5. This in itself is enough to distinguish *Leon v. Wainwright* from Holland's situation, which clearly involved a more typical case of unjustified force.

 Finally, McGinnis asserts that introduction at trial of Holland's confession constitutes harmless error, particularly given the weight of additional evidence against him. This is clearly incorrect as a matter of law. Submission to the jury of a coerced confession is a constitutional—and harmful—error. *Payne v. Arkansas*, 356 U.S. 560, 567, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958); *see also Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986); *Chapman v. California*, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 828 & n. 8, 17 L.Ed.2d 705 (1967). A coerced confession requires reversal "without regard to the evidence in the particular case." *Rose v. Clark*, 478 U.S. at 577, 106 S.Ct. at 3105; *see also Martinez v. Estelle*, 612 F.2d 173, 177 (5th Cir.1980) ("even if there is ample independent evidence of guilt"). Indeed, " '[c]onfessions of the accused are among the most powerful weapons employed in the prosecution of crimes. Nothing else can equal the impact upon the fact finder of an apparent admission of guilt by the party charged.' " *People v. Holland*, 121 Ill.2d at 172, 117 Ill.Dec. at 125, 520 N.E.2d

at 286 (Simon, J., dissenting) (quoting 2 J. Cook, *Constitutional Rights of the Accused* 21 (2d ed. 1986)).

In sum, we adopt the state trial court's finding that Holland suffered significant physical abuse at the Schiller Park police station. We rule that it was error for that court to admit Holland's subsequent statements to Des Plaines police officers, since those statements were tainted by the earlier abuse. Admission of a coerced confession is not harmless error.

## IV. Conclusion

The facts of the crime in this case are particularly repulsive. Holland's sordid actions, however, neither excuse the beating he received at the hands of the police after his arrest nor permit this Court to deny him his constitutional protections.

Holland involuntarily confessed following physical abuse at the hands of Schiller Park police officers. It makes no difference that he actually confessed shortly thereafter to a different governmental entity; the continuing effect of the earlier coercive practices acted to taint the Des Plaines statements. Admission of the confession at trial constituted harmful error. Additionally, we find that Holland, although white, has standing to bring a *Batson* equal protection claim on behalf of peremptorily excused black jurors. Our finding would entitle Holland to an evidentiary hearing but for the impermissible physical coercion, which entitles him to more expansive habeas relief. Holland's Petition for Writ of Habeas Corpus is granted. The Writ shall issue unless the state of Illinois elects to prosecute Holland within 120 days of the date of this order. It is so ordered.

## ON MOTION TO ALTER OR AMEND

ASPEN, District Judge:

On December 18, 1990, we granted Daniel Holland's petition for writ of habeas corpus. Respondents Kenneth McGinnis and Michael Lane now move to alter or amend the memorandum opinion and order. For the following reasons, we deny the motion.

Respondents' motion contains three primary arguments. First, they maintain that the December 18, 1990 order should be altered or amended because we "erroneously rejected the express factual finding by the Illinois Supreme Court that Holland had failed to make an adequate showing of a beating...." Motion, at 1. Respondents argue that the state supreme court's finding "recognized that the 'very severe physical confrontation' found by the trial court could have been just as likely caused by Holland rather than the police." *Id.* at 2. Holland, they contend, should not profit from an altercation—indeed, "physical[ ] attack"—that he initiated. *Id.*

We reject this argument. As we explained in some detail in our memorandum opinion and order, the factual findings of the state supreme court are, in this instance, not to be accorded the "presumption of correctness" usually given by a federal habeas court to all state court factual determinations. Op. at 1256–1257 & n. 5. The Illinois Supreme Court ignored the state trial court's findings; "its 'new factual finding'" that Holland had not shown that he had been beaten "was not an inference which could be drawn from the record as a whole [and] was an outright contradiction of the trial court's finding...." At 1256 n. 5 (quoting *Carter v. Gray,* 575 F.Supp. 190, 194 (N.D.Ohio 1983). As Justice Simon noted in dissent,

> it is uncontroverted that [Holland] sustained numerous injuries while in the hands of Schiller Park police. The trial court's finding that a "very severe physical confrontation" had taken place necessarily includes a finding of coercion; otherwise, the trial court would not have suppressed defendant's statements. In this light, the majority's insistence on an "affirmative finding" of brutality is little more than a semantic game.

*People v. Holland,* 121 Ill.2d 136, 175, 117 Ill.Dec. 109, 127, 520 N.E.2d 270, 288 (Simon, J., dissenting).

Respondents' second argument in support of the motion to alter or amend seeks to revitalize their earlier contention that "a break in the stream of events between the

first involuntary statement and the subsequent statement" removes the taint of coercion. Motion, at 3. Respondents further contend that we improperly distinguished two cases "virtually identical" to Holland's. *Id.* That is, that *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944) should stand for more than a "strict time schedule," *id.* and that *Leon v. Wainwright,* 734 F.2d 770 (11th Cir.1984) should not be shrugged off as an atypical circumstance of police coercion. As we noted in the memorandum opinion and order, involuntary confessions are properly measured by consideration of the "'totality of the circumstances.'" Op. at 1257 (citations omitted). We specifically distinguished *Lyons* on three grounds—the length of time between statements, that the second statement was not made to a familiar and trusted figure, and that the confession was not thereafter repeated. At 1258. And *Leon,* whether or not respondents like it, *is* an atypical police coercion case. Officers there used force and threats to determine the whereabouts of the still missing kidnap victim and "'not to obtain a confession or provide other evidence to establish [Leon]'s guilt.'" *Id.* (quoting *Leon,* 734 F.2d at 773 n. 5). All in all, we concluded that "[a]n analysis of the totality of the relevant circumstances demonstrates that Holland's second confession 'was tainted by the physical confrontation in Schiller Park....'" At 1258 (citation omitted). Respondents here supply no reason for us to alter or amend this finding.

Finally, respondents assert that we must back away from our finding that Holland, although white, has standing to bring a so-called *Batson* equal protection claim on behalf of peremptorily excused black jurors. Motion, at 4. Interestingly, their five-page argument on this issue revolves almost exclusively around "retroactivity analysis"—a subject not broached by either of the parties in their prior habeas memoranda. *See* pages 1254–1255 & n. 4. The rule in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) is that a juror's constitutional rights are violated when he or she is excluded from a jury on the basis of race, whether or not by use of a preemptory challenge. Page 1254. A contention that "we are extending the rule of *Batson* in a completely new direction" is not supported by retroactivity analysis. *Id.* Indeed, "[p]ermitting a white defendant to protect a black juror's equal protection rights is merely an application of the principle that governed the Supreme Court's decision in *Batson,* and is thus not a 'new rule' subject to the stringent dictates of retroactivity analysis." At 1254–1255 (citation omitted).

Further, Holland's tactical decision to not raise the equal protection argument before the United States Supreme Court does not foreclose habeas corpus relief. *See* page 1251 (citing *County Court of Ulster County v. Allen,* 442 U.S. 140, 149 n. 7, 99 S.Ct. 2213, 2220 n. 7, 60 L.Ed.2d 777 (1979); *Holloway v. McElroy,* 632 F.2d 605, 615 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981); *Barber v. Scully,* 557 F.Supp. 1292, 1293–94 (S.D.N.Y.1983)). Respondents' claim to the contrary does not distinguish these cases or offer any authority of any kind. We decline to accept it. It is so ordered.